**Marilyn E. HAASE, Appellant,**

v.

**Dr. Bernard T. GARFINKEL, Respondent.**

No. 52396.

Supreme Court of Missouri,
Division No. 1.

Sept. 11, 1967.

George R. Gerhard, St. Louis, for plaintiff.

Norris H. Allen, Anderson, Gilbert, Wolfort, Allen & Bierman, St. Louis, for respondent.

HOUSER, Commissioner.

The widow of Elmer C. Haase, Jr. brought this malpractice action against Dr. Bernard T. Garfinkel for the wrongful death of her husband. A trial jury awarded plaintiff $17,600. The circuit court sustained defendant's post trial motion for judgment in accordance with his motion for a directed verdict, and plaintiff appealed.

The petition charged that defendant, a heart specialist, accepted Mr. Haase as his patient, conducted examinations and tests on July 1 and 2, 1965 from which he made a diagnosis of myocardial infarction and arteriosclerotic heart disease, and knew that Mr. Haase was in danger of dying unless treated appropriately, but negligently and unskillfully discharged him from the hospital on July 3 without medication, prescription or advice and omitted to treat him, as a result of which Mr. Haase died on July 4. The case was submitted to the jury on negligent failure to prescribe and give anticoagulant drugs.

The single point on this appeal is that the court erred in its ruling for the reason that the evidence and inferences to be drawn therefrom demonstrate that defendant failed to use and apply that degree of care and skill required of him as a physician in the treatment of deceased.

Plaintiff's case consisted of her own testimony; that of her daughters and the pharmacist; the hospital records; excerpts from defendant's deposition, and an interrogatory and answer.

Viewed in the light most favorable to plaintiff, these are the essential facts: On Thursday, July 1, 1965 Mr. Haase awakened and complained to plaintiff of recurring pain in his left arm and chest. He had never made any similar complaints. At lunch time he stated that he thought he ought to see a doctor because he felt that he was having a heart attack. Referred to defendant as a specialist in heart diseases, he talked to defendant on the telephone and by prearrangement they met in the emergency room of Barnes Hospital early on the afternoon of July 1 where Mr. Haase related his complaints of chest pain, left arm pain, shortness of breath and nausea. Defendant accepted him as a patient and became responsible for him. At that time defendant suspected that he had an episode of angina pectoris (pain in the chest due to coronary artery insufficiency). The doctor ordered him hospitalized to rule out or in the possibility of an acute myocardial infarction (necrosis or death of the tissue of the heart muscle as a result of lack of blood supply to the arteries of the wall of the heart muscle). The patient arrived at his assigned room on a stretcher.

Electrocardiograms and a blood chemistry test to determine the concentration of enzymes in the blood stream, as well as several routine tests, were run. One of the EKG's was not found when this case was investigated, but the available one showed a slow heart rate with some sinus arrythmia (interrupted, abnormal rhythm) but otherwise normal. The only medical interpretation of the EKG was that it was normal. The enzyme test was found to be normal.

Mr. Haase remained in the hospital until 1:30 p. m. July 3, essentially resting and in no distress except for fleeting chest pains. On July 3 defendant discharged him to go home and rest, directing that he leave the hospital in a wheelchair. (There was no such order on the "order sheet" of the

hospital records and in fact he walked out.) Mr. Haase was instructed to see defendant at his office the following Tuesday, July 6.

On Mr. Haase's departure from the hospital defendant noted in the medical record: "PT [patient] has been comfortable since coming into hospital. Occ [occasional] fleeting chest pains. EKG's normal. Enzymes normal. We have no ecidence for infarct [infarction]. Though this could be angina it is atypical. Pains are fleeting—not constant. Will allow him to go home to watch. We must assume this man has cor [coronary] insufficiency till proved otherwise though this could all be GI [gastro-intestinal] tract SX [symptoms]." Defendant did not think the trouble was in the gastro-intestinal system, and gave no GI tests because "you don't take a person who has had a recent attack of pain and put him through a GI series." Defendant considered that the most likely diagnosis was coronary artery insufficiency. Interne Dr. Smith, however, in writing the discharge summary, made this discharge diagnosis: "Arteriosclerotic heart disease; Myocardial infarction." When this 'lawsuit was threatened defendant read the records and noted in his handwriting "There is no evidence for this diagnosis."

The terms coronary insufficiency, coronary artery disease and coronary artery insufficiency, used interchangeably, refer to a condition in which the flow of blood through the coronary arteries to the heart muscle is obstructed; a narrowing of the arteries through arteriosclerosis or blood clots forming in the arteries, cutting off an adequate supply of blood to the heart. Myocardial infarction is a result of coronary artery insufficiency.

Dicumarol, coumadin, nitroglycerine and peritrate are some of the anticoagulant drugs used in the treatment of heart disease to prevent clots from forming in narrowed coronary arteries, or arteries afflicted with arteriosclerosis. They lower and inhibit the clotting ability of blood. There are hundreds of dilator drugs grouped in the anticoagulants which are used to treat coronary insufficiency. Mr. Haase was not given any of these drugs during his 48-hour stay at the hospital, and none of these was prescribed for him at the time of his discharge. He was driven home, where he spent the evening in bed, getting up only for meals. On Sunday morning, July 4 he awakened with pains in his chest and arm. He ate a good breakfast and was sitting in the living room reading a newspaper when he was seized with a severe chest pain. He went to bed with a heavy heart pain, perspiring. Mrs. Haase tried to get a doctor at the hospital. Eventually Dr. Strauss, defendant's office associate, called her and after she had described the pains he said he was sending two prescriptions. One was a tablet to be kept under his tongue for 5 minutes. (Nitroglycerine.) If that did not relieve the pain the procedure was to be repeated 3 times. If that still did not relieve the pain she was instructed to give him the other prescription. (An analgesic.) Feeling better, Mr. Haase got up and shaved. Thereafter he was seized with the last and most severe pain. Plaintiff called the drugstore, called a neighbor, called the fire department, which gave him two tanks of oxygen, to no avail, and he died. During this period plaintiff had been in telephone communication with defendant, who stated that he should never have let him out of the hospital and advised getting him right back. Finally the drugstore delivered the medicine but by that time Mr. Haase had died.

An autopsy was performed 6 hours after death. The provisional anatomical report listed the cause of death as acute myocardial infarction, with a provisional diagnosis showing that the primary cause of death was "Arteriosclerosis of the coronary artieries (advanced) with focal narrowing; aorta (moderate) with calcification and ulceration; renal arteries (slight); and cerebral arteries (moderate) with atheroma (history of sudden death in a paroxysm of

chest pain)," and 2. "Cardiac hypertrophy (475 gm.)." An anatomical diagnosis filed in January, 1966 (following the filing of this suit on January 4) stated that the patient "remained free of chest pain while in the hospital and a work-up for a suspected myocardial infarction was negative." In reviewing the autopsy the summary proceeded: "There was no gross occlusion of the coronary arteries. Microscopic examination of a section of coronary artery with marked focal narrowing revealed a recent thrombus on a large intimal plaque. There was no gross or microscopic evidence of myocardial infarction. This man probably had an anginal episode a few days prior to death. The terminal event could have been an acute myocardial infarction and/or an arrythmia."

Based on a telephone conversation with the pathology department defendant wrote plaintiff a letter advising her that the autopsy showed extensive arteriosclerosis involving all the major coronary arteries, progressive and almost complete occlusion of these arteries and acute thrombosis or blood clot of the remaining open vessel.

From defendant's deposition plaintiff read as admissions against interest the following: When defendant discharged Mr. Haase from the hospital he felt that he probably had narrowing of his coronary arteries; that this was the most likely, although he had no definitive diagnosis at the time; that most likely the pain had been secondary to a transient episode of coronary artery insufficiency; that the drugs "most often used are anticoagulant, such as dicumarol or coumadin, nitroglycerine and long acting dilator drugs, of which there are hundreds, but which peritrate is a drug that is used frequently," and that he discharged Mr. Haase from the hospital with no prescription. In answer to an interrogatory defendant answered that the prescribed treatment for a hypothetical case of suffering from chest and arm pain, nausea and shortness of breath is: no medication except mild sedative; with careful observation of the pulse, blood pressure, heart, lungs and general clinical state, with observation of serial electrocardiograms and blood enzymes. "A myocardial infarction is treated with strict bed rest from two to four weeks, with oxygen if necessary, heavy sedation, narcotics for pain and sometimes with anticoagulant therapy." He indicated that successive electrocardiograms showing what this man's EKG's showed "are frequently present in a healthy individual."

Defendant testified that while he would not have prescribed nitroglycerine for Mr. Haase on Sunday, July 4 he may well have put him on nitroglycerine eventually; that he uses this drug as a symptomatic drug, in patients with coronary artery disease.

Plaintiff did not produce any medical testimony on the question whether the discharge of Mr. Haase from the hospital without medication or prescription and the failure to prescribe and give anticoagulant drugs would constitute a failure on the part of the defendant to exercise that degree of care, skill and proficiency which is commonly exercised by the ordinarily careful, skillful and prudent heart specialist under the same or similar conditions.

Defendant's case consisted of the testimony of a highly qualified heart specialist, Dr. Massie; that of the interne Dr. Smith, and defendant's own testmony. Dr. Massie testified that the EKG's were perfectly normal and that the tracings showed that the heart muscle was not involved; that the coronary blood flow was adequate, "so that the heart muscle showed no electrical abnormality." Further, that if the patient had had a myocardial infarction the enzyme test should show abnormality but the enzymes were normal in this case; that the evidence indicates that the patient did not have a myocardial infarction and that defendant's findings and conduct in allowing the patient to go home on July 3 were a reasonable conclusion, based on the hospital record, cardiographs, enzyme tests, etc.; that based on the clinical evidence a reasonably careful and

skillful physician would conclude that there was no evidence of myocardial infarction; that the assumption that the man had coronary insufficiency but that "this may all be GI symptoms" is a reasonable conclusion in the exercise of ordinary care and skill; that organs that may be the cause of chest pain include the lungs, ribs, stomach, esophagus, diaphragm, and that a reasonably careful and skillful physician would conclude that the symptoms might have been caused by gastro-intestinal symptoms after the work-up was done at the hospital; that the failure of defendant to put Mr. Haase through GI tests at the time was excellent judgment; that this would have been the wrong treatment because these tests are fatiguing; that there are many pros and cons in the use of anticoagulant drugs, and that there are thousands of articles on whether they should be given or not, and that there are a lot of opinions against giving such treatment.

The interne testified that he agrees with defendant that there is no evidence for the diagnosis of myocardial infarction; that in writing this diagnosis in the discharge summary he was influenced in his thinking by the fact that the patient had a recurrence of chest pains the day after discharge, and with the knowledge that he had died. In effect, he took back what he had previously written. He also denied that anticoagulants are a rather basic, common treatment for that heart condition.

Defendant denied that he made a diagnosis of myocardial infarction. He was of the opinion that Mr. Haase had no damage to his heart muscle at the time he left the hospital. The postmortem did not cause him to change this opinion. He thoroughly presented the case against the use of anticoagulants and testified that in his practice he had almost abandoned the use of anticoagulants in coronary artery disease without myocardial infarction; that he elected not to use the anticoagulant therapy on this patient; that it takes 48 hours before coumadin has any effect, 72 hours before dicumarol has any effect, and 5 to 8 days before levels of decrease "or what we call the therapeutic range of anticoagulation can be reached with these drugs"—that it would have taken the blood from 5 to 8 days to become "anticoagulated"; that there is no medication that would prolong life in coronary heart disease.

Plaintiff argues that all the evidence and the reasonable inferences to be drawn therefrom favorable to plaintiff proves that Mr. Haase died as a result of defendant's failure to properly treat him for a disputed, but proven, diagnosis and condition of myocardial infarction, or an admitted diagnosis and condition of coronary artery insufficiency, and that plaintiff proved "out of the collective mouths of the defendant, that defendant failed to exercise that degree of care that an ordinarily careful and prudent physician would have exercised" in the treatment of Mr. Haase.

We have concluded that plaintiff failed to make a submissible case and that the court properly sustained defendant's motion for judgment in accordance with his motion for a directed verdict.

The evidence does not show that Mr. Haase died as a result of failure to treat a proven diagnosis of myocardial infarction; the case was not submitted to the jury on that theory. All of the evidence in the case, with the exception of the statement by the interne Dr. Smith in the hospital record, shows that when Mr. Haase left the hospital he had not suffered a coronary occlusion or myocardial infarction. Dr. Smith's notation, made after the death in contemplation of postmortem information, was repudiated by Dr. Smith at the trial. This theory of the case was abandoned.

■ Plaintiff submitted on negligent failure to prescribe and give anticoagulant drugs, but neglected to prove that de-

fendant's omission constituted a departure from the standard of skill and proficiency to be expected of a cardiologist. There is no such expert medical evidence in this record. Its omission is fatal to plaintiff's case. The only evidence on this point is to the contrary, namely, that defendant exercised a reasonable medical judgment in the manner in which he conducted himself as a doctor in this case.

■■■ Whether anticoagulant drugs should have been administered to Mr. Haase under the circumstances shown in evidence is a question beyond the knowledge and competence of lay jurors. In specialized matters such as these the jurors must be guided by specially trained experts lest they " 'be cast into a river of doubt' " and required to " 'establish an arbitrary standard of their own founded upon conjecture and surmise' ". Fisher v. Wilkinson, Mo.Sup., 382 S.W.2d 627, 632. In Hart v. Steele, Mo.Sup., 416 S.W.2d 927 (No. 52,549, 1967) we reiterated the rule that in the great majority of malpractice cases a submissible case may only be made by expert medical testimony; that where the matter at issue involves knowledge beyond the ken of the average juror, highly trained experts, knowledgeable in the field, are needed to aid the jury in reaching a conclusion on whether the conduct of the defendant doctor violated the standards expected of ordinarily careful, skillful and prudent doctors acting under similar conditions.

Plaintiff, however, insists that defendant and all of his witnesses admit that Mr. Haase was suffering from coronary artery insufficiency when he was in and when he left the hospital and that he died as a result of this condition, and that the foregoing, taken with the following testimony of defendant and Dr. Massie, is conclusive of defendant's liability to plaintiff in failing to properly treat the patient. Plaintiff refers to defendant's testimony that there are many drugs that can be and often are used in treating coronary insufficiency (naming the dilator drugs); that the purpose of anticoagulants is to try to prevent blockage of the heart due to a narrowed artery or clot; defendant's concession that he used nitroglycerine in patients with coronary heart disease, as a symptomatic thing and well may have put Mr. Haase on nitroglycerine eventually; the fact that defendant's associate Dr. Strauss rushed nitroglycerine to Mr. Haase in his last extremity, and defendant's admission that he did not prescribe any of the anticoagulants when he discharged the patient from the hospital.

These excerpts from the testimony, however, must be read in context and when so considered they do not bridge the gap for plaintiff. Defendant explained that "there are pros and cons that rage with the efficacy about all of these drugs"; that their use is a controversial type of treatment; that since the making of the original report of this type of therapy there has been an increasingly greater number of people who are opposed to this type of treatment, because as the drugs have been used more and more they have learned new things about them; that studies have shown that the drugs did not prevent clotting, and the incidence of blood clots in people taking anticoagulants was as high as those patients who were not taking them; that the drugs have been shown in some instances to actually increase the risk to patients with coronary heart disease; that complications include bleeding from the kidneys, stomach and colon, and they can cough up blood; bleeding enough to go into shock, with drop in blood pressure, causing changes in circulation, which may affect the heart; that they may cause pulmonary embolus; that he has "almost abandoned" the use of anticoagulants in coronary heart disease without myocardial infarction. He further testified that nitroglycerine has potent side effects, dilation of other blood vessels in the body, the stomach, leg and head arteries; that patients get a pounding in the head, and their blood pressure may fall, thus some-

times producing further damage to the heart muscle; that at the time he felt that there were certain risks about using it and that he "wanted to know more about him" first. The totality of defendant's testimony on this phase of the case was that while there are many drugs used by many doctors for this purpose, and even by defendant "in the patient in whom I have established a well-determined pattern of pain with exertion and relief with rest," nevertheless these people are treated and the drugs are used "according to the situation," "under specific situations." In this case defendant deemed further tests and studies necessary before using these drugs. He had not ruled out GI involvement.

Dr. Massie testified that there are many pros as well as cons about the use of anticoagulant drugs; that "[a]t every medical meeting, almost every other year in the Heart Association, there is (sic) pros and cons, and believe me there are a lot of cons, I mean against this treatment, as much as pro the treatment. One has to individualize and this I am sure is in every pamphlet that will be put out by the Heart or similar association."

In this context the testimony referred to by plaintiff provides no basis for plaintiff's contention that out of their own mouths the defendant and his witnesses showed that defendant failed to exercise proper care in treating Mr. Haase.

Another rule plagues plaintiff, namely, the "honest error of judgment" rule. Williams v. Chamberlain, Mo.Sup., 316 S.W.2d 505, 510. Suspecting that the patient had coronary insufficiency, defendant had to decide whether to immediately begin anticoagulating drug therapy. Under the evidence it appears that there is a strong dichotomy in the medical profession on the advisability of using these drugs; that many respectable authorities hold to the view that their possible side effects rule out their use in the cases of many patients. Even if defendant had been mistaken about their use in Mr. Haase's case he was entitled to a wide range in the exercise of his judgment and discretion and could not be found guilty of negligence "unless it be shown that the course pursued was clearly against the course recognized as correct by the profession generally. As long as there is room for an honest difference of opinion among competent physicians, a physician who uses his own best judgment cannot be convicted of negligence, even though it may afterward develop that he was mistaken." Snyder v. St. Louis Southwestern Ry. Co., 228 Mo.App. 626, 72 S.W.2d 504, 512. According to the only evidence in this case on the subject there is an honest difference of opinion about the advisability of the use of these drugs. This record reveals no evidence that defendant's conduct ran counter to the course of treatment recognized by the profession generally, or that he made a mistake. If in retrospect (the patient having died the day after his discharge from the hospital) it might appear that a mistake was made, plaintiff still fails to make a case for lack of evidence from which a jury might conclude that defendant did not exercise his best judgment in deciding against the immediate administration of anticoagulant drugs.

No error appearing, the judgment is affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

HENLEY, P. J., and SEILER and HOLMAN, JJ., concur; STORCKMAN, J., not sitting when cause was submitted.