Chrystine S. SAVAGE, a minor, et al., Appellants,

v.

CHRISTIAN HOSPITAL NORTHWEST, a corporation, Appellee.

No. 75–1841.

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1976.

Decided Oct. 13, 1976.

Rehearing and Rehearing En Banc Denied Nov. 5, 1976.

Paul S. Brown (argued), St. Louis, Mo., on brief, for appellants.

Ralph C. Kleinschmidt (argued), St. Louis, Mo., on brief, for appellee.

Before HEANEY and HENLEY, Circuit Judges, and SCHATZ, District Judge.*

SCHATZ, District Judge.

Plaintiff, Chrystine S. Savage, a minor, by and through her guardian, Glen E. Savage II, brought this diversity action[1] under the laws of the State of Missouri. The matter in controversy exceeds, exclusive of interest and costs, the sum of $10,000. 28 U.S.C. § 1332.

---

\* The Honorable Albert G. Schatz, United States District Judge for the District of Nebraska, sitting by designation.

1. Plaintiff is a citizen of the State of California and defendant is a corporation incorporated

against defendant, Christian Hospital Northwest, for alleged malpractice and negligence in the treatment and care of her deceased father.

The District Court[2] granted a motion for directed verdict in favor of the defendant at the close of plaintiff's case. Judgment was entered accordingly and this appeal now follows. We affirm.

Under both federal and Missouri law "[a] verdict can be properly directed only when the evidence is such that, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict." *Meitz v. Garrison,* 413 F.2d 895, 896 (8th Cir. 1969). "A directed verdict is in order only where the evidence points *all one way* and is susceptible of *no* reasonable inferences sustaining the position of the nonmoving party." *Giordano v. Lee,* 434 F.2d 1227, 1231 (8th Cir. 1970), *cert. denied,* 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971). "In making this determination, the evidence, together with all reasonable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party." *Decker-Ruhl Ford v. Ford Motor Credit,* 523 F.2d 833, 836 (8th Cir. 1975).

With the above strict principles in mind, we proceed to examine the record and theories of recovery advanced by plaintiff.

On August 17, 1973, the decedent, Glen E. Savage, age forty-nine, was admitted to the emergency room at defendant hospital with a sudden onset of severe chest pain, shortness of breath, and severe diaphoresis (profuse perspiration). An electrocardiogram (EKG) revealed an acute inferior wall myocardial infarction. The decedent was hospitalized under the care of Doctor John M. Laird. His symptoms responded to treatment over the next several days. He continued to improve, was ambulate, visited daily with family and friends, and was preparing to be discharged on September 5, 1973. During his course of treatment, further EKG's showed no significant changes.

At approximately 9:45 a. m. on September 4, 1973, the day prior to his scheduled discharge, decedent began to suffer mild chest discomfort, dyspnea (labored respiration), peripheral cyanosis (bluish discoloration) and diaphoresis. The nurses' notes indicate that a house doctor was called at this time. The notes further indicate that a stat EKG was taken and medication and sedatives administered.

Chrystine Savage and her sister, Carol Savage, received notice of their father's condition at approximately 10 a. m. from a patient at the hospital. Upon their arrival at the hospital shortly thereafter, Chrystine remained in the lobby and Carol went upstairs to see their father. He was conscious and able to speak, although he appeared "very weak" and "pale." The only other persons in the room were two nurses' aides; a nurse was just leaving. No doctor was present.

At approximately 10:30 a. m., the decedent was moved to an intermediate care room at which time he became "more drowsy and just weaker than he had been before." Carol remained in the room with her father or immediately outside the door until approximately noon. At that time she went downstairs to see Chrystine and call her brother. While she was in the lobby, Ronald Kahrer, a business associate of the decedent, arrived and Carol explained the situation to him. They returned to her father's room at approximately 12:45 p. m. He appeared very blue, was nauseated and had great difficulty speaking. After failing to contact Doctor Laird by telephone, Ron and Carol went to the nurses' station and requested a house doctor be called to check on her father. Ron then went to the medical building located adjacent to the hospital in an attempt to contact Doctor Laird. Carol returned to her father's room. The house doctor, Doctor Baetto, was notified at approximately 2 p. m. He arrived shortly thereafter and the decedent was pronounced dead at 2:22 p. m.

**2.** The Honorable John K. Regan, United States District Court for the Eastern District of Missouri.

A post-mortem examination listed two factors as the cause of death: (1) massive myocardial infarction; and (2) massive pulmonary embolism (saddle thrombus). Myocardial infarction means death of heart muscle tissue and anyone who has a myocardial infarction lives under threat of sudden death. Pulmonary embolism is the obstruction of the flow of blood to the lungs from the saddle thrombus.

The plaintiff contends that defendant hospital was negligent in failing to have a doctor in attendance to give prompt and proper care to the decedent. Assuming without deciding that the record supports such a finding, there was no medical evidence adduced that such acts or omissions caused the alleged wrongful death of plaintiff's father.

▉ It is a generally recognized rule in malpractice cases, as in other actions based upon negligence, that the plaintiff has the burden to prove a causal connection between the negligence complained of and the injury suffered. This rule rests upon the fundamental principle that one shall be liable only for that harm which he has caused.

The [plaintiff] of course [has] the burden of proof on the issue of the fact of causation and must introduce evidence which affords a reasonable basis for one to conclude that it is more likely than not that the defendant's conduct was a substantial factor in bringing about the result. "In negligence cases and especially in malpractice cases, proof of causal connection must be something more than consistent with the plaintiff's theory of how the claimed injury was caused." Proof of causation cannot rest on conjecture and the mere possibility of such causation is not enough to sustain the [plaintiff's] burden of proof. Furthermore, when the causal relation issue is not one within the common knowledge of laymen, causation in fact cannot be determined without expert testimony. (Citations in text omitted.)

*Walstad v. University of Minnesota Hospitals,* 442 F.2d 634, 639 (8th Cir. 1971).

*See also* 1 S. Guard, *Jones on Evidence,* § 5.12 (6th Ed. 1972); W. Prosser, *Handbook of the Law of Torts* 241 (4th Ed. 1971).

The rule is the same in Missouri. *See Haase v. Garfinkel,* 418 S.W.2d 108 (Mo. 1967); *Kappel v. Slickman,* 401 S.W.2d 451 (Mo.1966); *Steele v. Woods,* 327 S.W.2d 187 (Mo.1959); *Williams v. Chamberlain,* 316 S.W.2d 505 (Mo.1958).

▉ It is true, as argued by plaintiff, that certain situations may exist from which a jury may infer that an injury occurred as a result of malpractice on the part of a doctor or hospital, although there may be no expert testimony on that particular issue. *See Steele v. Woods, supra,* 327 S.W.2d at 199. But this is not such a case. Where the matter in issue involves knowledge beyond the grasp and ken of the average juror, highly trained experts, knowledgeable in the field, are needed to aid the jury in reaching a determination as to whether medical facts or omissions were violative of the standards expected of ordinarily careful, skillful and prudent doctors, acting under similar conditions. *Haase v. Garfinkel, supra,* 418 S.W.2d at 113. In the instant case the ultimate success of any diagnosis and treatment could only be determined in the light of highly specialized medical knowledge. Expert testimony in this regard was essential to support plaintiff's conclusions as to causation in fact. This record is barren of any such testimony and proof, or logical and valid inferences, in this regard, and for this reason, plaintiff has failed to make a submissible case.

Plaintiff theorizes that a house doctor could have attended the decedent, diagnosed the symptoms of a pulmonary embolism, and possibly saved his life by administering proper treatment. This argument pyramids conjecture upon conjecture without any expert testimony in support thereof. The uncontradicted evidence showed that two factors caused death, namely myocardial infarction and pulmonary embolism. There is no evidence in this record to suggest that such factors would not have

**48**

caused death in spite of the most careful and skillful diagnosis and treatment. .

[T]o recover for lack of diligence of a physician in attending a patient the plaintiff must show that such lack of diligence was a proximate cause of the injury for which redress is sought, and a mere showing of negligence on the part of the physician is not sufficient to sustain the action. In other words, in addition to a showing of negligence on the part of the physician, it must also be shown that if proper attendance had been given, a more satisfactory result would have followed. Annot. 57 A.L.R.2d 379, 390 (1958). *See also* Annot. 13 A.L.R.2d 11 (1950).

Plaintiff's reliance on *Jeanes v. Milner,* 428 F.2d 598 (8th Cir. 1970), is misplaced. Therein it was specifically noted:

[T]here is evidence in the record from which it can be inferred that [the decedent's] life would have been saved or at least prolonged and his pain lessened had he received early treatment.

*Id.* at 604.

In the instant case there is simply no such evidence to demonstrate that anything might have been done by anyone in the diagnosis and treatment of the decedent which would have prevented his unfortunate death at the time and in the manner that it occurred. Accordingly, plaintiff failed to prove causation in fact, an essential element of any malpractice action.

Plaintiff also contends that the District Court erred in ruling that the Missouri Wrongful Death Statute controlled the parties and the damages obtainable in this action.[3] Because of our disposition of this case upon the ground that plaintiff failed to make a submissible case on the issue of

causation in fact, we do not meet or consider this question.

The judgment is affirmed.

Under California law, the maintenance of a wrongful death action is not limited to minor children but may be brought by the decedent's heirs, and there is no statutory maximum on recovery. Cal.Civ.Pro. Code § 377 (West 1973). The District Court found Missouri law should govern this aspect of plaintiff's action and dismissed those counts of the complaint which relied upon California law.

3. Under Missouri law, the facts of this particular case limited the right to maintain a wrongful death action to the minor child or children of the decedent, Mo.Rev.Stat. § 537.080(1) (Supp.1975), and at the time of the decedent's death, limited recovery to an amount not exceeding $50,000, Mo.Rev.Stat. 537.090 (1969). (This statute has since been amended to remove any limitation on recovery in wrongful death actions.) Mo.Rev.Stat. § 537.090 (Supp. 1975).