Bernece DEPPER, Plaintiff-Respondent,

v.

James R. NAKADA, Executor of the
Estate of Fred Emmert, M.D.,
Defendant-Appellant.

No. 36776.

Missouri Court of Appeals,
St. Louis District,
En Banc.

June 21, 1977.

Motion for Rehearing and/or Transfer
Denied Sept. 12, 1977.

Application to Transfer Denied
Nov. 14, 1977.*

* Rendlen, J., not participating.

George E. Lee, Doris J. Banta, St. Louis, for defendant-appellant.

Hanks & Taylor, W. Morris Taylor, Clayton, for plaintiff-respondent.

RENDLEN, Judge.

James R. Nakada, Executor of the Estate of the Deceased, Fred Emmert, M.D., appeals from the judgment awarding plaintiff $25,000 for Emmert's medical malpractice. We affirm.

In May of 1945, plaintiff suffered thrombophlebitis in her left leg and was bedridden for approximately eight weeks. The swelling and soreness of the leg disappeared three weeks later and she had no "flare-up" or recurrence of the condition until July 1966. Plaintiff consulted Dr. Emmert professionally in October 1945 and continued as his patient until 1966, except for a period 1963 to 1965 when he temporarily retired from practice. As early as 1955, while attending the birth of plaintiff's son, Emmert was made aware of her history of thrombophlebitis.

In June of 1966, Dr. Emmert prescribed medication for plaintiff's overweight condition "[a]nd maybe some blood pressure, but mainly weight conditions." Certain treatment consisting of three alleged injections of mercuhydrin which gave rise to this litigation was administered in July of that year.

Plaintiff's husband testified[1] she received an injection on July 6 and shortly thereafter her arm and shoulder became sore, "swollen, discolored and the skin looked kind of shiny like . . . .." A second injection on July 13 was followed by a reaction in plaintiff's left leg with symptoms similar to those observed in the arm. After a third visit to Dr. Emmert and a third injection on July 20 or 21, plaintiff became ill and in a few days her left leg was painfully swollen and feverish. On July 26, 1966, plaintiff consulted Dr. Allen Klippel and was admitted to St. Luke's Hospital August 2 where she remained under treatment for five days. After her release plaintiff continued to experience discomfort and occasionally inflammation accompanied by severe pain in her leg.

In July, 1966 Dr. Emmert knew of Mrs. Depper's prior disabling experience with thrombophlebitis and her predisposition to this ailment. It is also undisputed that mercuhydrin can trigger allergic reactions, typically thrombophlebitis in one with Mrs. Depper's medical history. Dr. Emmert apparently realized this because the first shot of mercuhydrin administered on July 6, 1966 was a small test dose of ½ c.c. Thrombophlebitic symptoms soon appeared and though they persisted he administered a second and later a third shot of the offending drug eventuating in her hospitalization.

Plaintiff and her husband filed suit jointly for malpractice on February 2, 1969, but dismissed that action without prejudice after Emmert's death in 1970. In the present suit plaintiff's husband dismissed his claim at the commencement of trial for the announced purpose of avoiding disqualification of his testimony under the Missouri Dead Man's Statute, § 491.010. The cause was tried and a plaintiff's verdict rendered.

Defendant for his allegation of error, contends: (1) the evidence was insufficient to establish any negligent act or omission of Dr. Emmert as a cause of plaintiff's thrombophlebitis because plaintiff's medical expert testimony did not establish negligence or causal connection between Emmert's

1. Plaintiff's testimony relative to her treatment and illness were ruled inadmissible under the

Dead Man's Statute, § 491.010, RSMo 1969, V.A.M.S.

treatment and plaintiff's phlebitis; (2) the trial court erred permitting plaintiff's expert witness to express opinions based upon the hypothetical questions addressed to him, as facts assumed in those questions were not supported by the evidence; and (3) the trial court erred in permitting Earl Depper's testimony as to conversations with Dr. Emmert.

In ruling defendant's challenge to the sufficiency of the evidence in this jury-tried case, we consider "the evidence in the light most favorable to plaintiff. The evidence favorable to plaintiff is considered as true, and plaintiff is given the benefit of every reasonable inference therefrom; and defendant's evidence, unfavorable to plaintiff, is disregarded." *Boyd v. Terminal Railroad Ass'n of St. Louis*, 289 S.W.2d 33, 35[1] (Mo.1956). The plaintiff is entitled to a view of the evidence "from a viewpoint most favorable to plaintiff and [we] give plaintiff the benefit of every reasonable inference which the evidence tends to support . . . . On the other hand, we disregard defendant's evidence unless it aids plaintiff's case." *Wardenburg v. White*, 518 S.W.2d 152, 154[1] (Mo.App. 1974). Guided by these standards we examine appellant's *second* allegation of error concerning sufficiency of the proof of facts assumed in the hypothetical questions propounded to plaintiff's expert Dr. Barrow. Barrow had been plaintiff's treating physician after her hospitalization in July 1966. The hypothetical questions propounded and the answers concerning Emmert's negligence were as follows:

"Q. Now, Doctor, . . . I want you to assume that the plaintiff was injected with a drug . . . called mercuhydrin; that she received three injections, one on July 6, 1966, one on July 13, 1966, and one on July 21, 1966 . . . that the *sole* reason for Mrs. Depper being treated at this particular time was for weight loss and that she was being treated, as her history explained to you, by Dr. Fred Emmert . . . Now, Doctor, . . . Do you have an opinion based upon a reasonable degree of medical cer-

tainty as to whether or not Dr. Emmert used that degree of skill and learning ordinarily used by other doctors in 1966 under the same or similar circumstances by using this drug for weight loss? (Emphasis added.)

\*     \*     \*     \*     \*     \*

A. I have an opinion, yes.
Q. Would you tell us what that opinion is please?
A. That mercuhydrin—that at that time and now, mercuhydrin would not be considered an appropriate drug for treatment of excessive weight or obesity.

\*     \*     \*     \*     \*     \*

Q. . . . The question is, based on a reasonable degree of medical certainty, whether or not you feel that Dr. Emmert was exercising that degree of skill and learning normally exercised by other doctors in 1966 under the same or similar circumstances . . .
A. Not in giving three injections of mercuhydrin for weight reduction."

Testifying further, the witness described mercuhydrin as a drug ordinarily used as a diuretic in treatment of heart failure but not as treatment for obesity. He explained that in some instances the drug produced undesirable effects such as patient dehydration, allergic reaction, hives or skin rashes and these effects "[u]sually . . . occur after the drug had been used more than once."

The witness was then asked by hypothetical question for his opinion of the causal relation between the treatment administered and plaintiff's thrombophlebitis. The question assumed as fact plaintiff's 1945 thrombophlebitis which remained dormant until 1966 when defendant had administered three injections of the drug mercuhydrin followed by the recurrent illness; the question continued:

"Q. . . . based upon a reasonable degree of medical certainty as to the competent producing cause of Mrs. Depper's condition as you first observed it in 1966 and as you know the condition today?

\*     \*     \*     \*     \*     \*

A. I have an opinion that something caused the thrombophlebitis suddenly to flare up.

Q. Will you tell us what that something was, Doctor, in your opinion?

A. I think it was the three injections that she received.

Q. Would that be from the drug mercuhydrin you are referring to?

A. Yes."

Appellant argues there was no evidence of Dr. Emmert's having given plaintiff *three* injections of mercuhydrin and thus no evidentiary support for the hypothetical questions posed. We do not agree. The following testimony of Mr. Depper concerning his phone conversation with Dr. Emmert on the day plaintiff entered the hospital as Dr. Klippel's patient in July of 1966 goes to this point: (The questions and answers are numbered for convenient reference.)

[1] "Q. Please tell us the nature of the conversation, Mr. Depper.

[1a] A. [Mr. Depper] I said to the doctor, I said, my wife has been put in the hospital. He said, what for? Her leg is so bad she can't walk on it. I said, what did you give her?

[2] Q. Did he reply to you?

[2a] A. Yes. He said, I gave her *a shot of mercuhydrin.* I said, what did you do that for? He said, to take the fluid out of her body and make *her slim and trim.*

[3] Q. That was his answer to you?

[3a] A. Right.

[4] Q. Now, did he indicate to you whether or not he had given her a shot or more than one shot?

[4a] A. He told me he had given her *two in the hip and one in the arm.*" (Emphasis added.)

In addition, Emmert's records confirm that a one-half c.c. mercuhydrin injection was administered July 6 and, as pointed out above, other testimony indicates that injection was followed by an adverse reaction in plaintiff's arm; similar adverse reactions followed each visit to Emmert's office culminating in her severe illness and hospitalization.

■ It has been argued that Mr. Depper's testimony is not sufficient to make a jury issue of whether vel non *three shots* of mercuhydrin were administered. The foregoing excerpt of Mr. Depper's testimony occurred early in the trial, appearing at pages 74 and 75 of the 247 page transcript but it is significant that from that testimony the *trial judge believed* counsel and witness had referred to *three* shots of mercuhydrin and so interpreted questions and answers, # 1 through # 4. The following statement of the trial judge appears during a conference at the bench shortly after Mr. Depper testified:

"Now, *you do have testimony* through the husband that Dr. Emmert *admitted giving three injections of this mercuhydrin*" (Emphasis added.)

Additionally, the fact that *three shots* had been given was reaffirmed during cross-examination of Mr. Depper when defense counsel attempted to impeach Mr. Depper by confronting him with records of Dr. Emmert which showed only "*one shot*" of mercuhydrin had been administered as contrasted with the witness' contrary testimony of *three* shots.

(Cross-examination of Mr. Depper)

"Q. If Dr. Emmert's records show that he only gave her one shot of mercuhydrin and that was one-half c.c. on July 6, 1966, does that refresh your recollection as to what he told you?

A. That *isn't what* he told me. (Emphasis added.)

\*    \*    \*    \*    \*    \*

Q. (By Mr. Lee) Are you telling the jury that his record is incorrect if it says he gave her one-half c.c. mercuhydrin for fluid on July 6, 1966?

A. I am saying that either his record is incorrect or what he told me is incorrect; one of the two don't match, that's for sure."

From this it is apparent that defense counsel also believed that Mr. Depper's testimony on direct examination established a basis

for finding three shots of mercuhydrin had been administered, as the thrust of the cross-examination was an attempt to impeach such testimony and show that "he (Emmert) only gave her one shot of mercuhydrin" but witness Depper, withstanding the impeachment effort, stated "That isn't what he (Emmert) told me." Further, defense counsel did not object or question the sufficiency of proof that three shots of mercuhydrin had been given, when this factual element was included in plaintiff's hypothetical question to the expert witness, Dr. Barrow. Though defense counsel, during Barrow's testimony, did object that there was "no evidence in this case concerning the quantity or the volume" of the injections. It may be fairly argued that three shots of mercuhydrin was postulated in the hypothetical without objection because the proof warranted its inclusion. It cannot be said there is "a complete absence of probative fact" to support the verdict so the appellant court should interfere. *Stevens v. Wetterau Foods, Inc.*, 501 S.W.2d 494, 496[3] (Mo.App.1973). The matter of *one shot* versus *three shots* became a question of credibility for the jury to determine.

Defendant argues that the phone conversation indicates only one injection of mercuhydrin was administered and the other two (if given at all) were not that drug. Further, the records of Dr. Emmert introduced by plaintiff show that on July 6, 1966, he gave plaintiff "one-half c.c. mercuhydrin for fluid" and that on July 13, 1966, he gave her two c.c. premerin (for female disorders) and on July 21, 1966, he gave her an injection of two c.c. of estrone (also for female disorders) arguing that plaintiff is bound by the records of Dr. Emmert which plaintiff had introduced and urging that conclusions favorable to defendant be drawn from that evidence. This we may not do.

■ While it is generally true that the party who has adduced evidence is bound thereby, *Williams v. Cavender*, 378 S.W.2d 537, 541[5] (Mo.1964), this rule does not apply when the same party introduces testimony which *contradicts* that evidence.

*Dodwell v. Missouri Pacific R. R. Co.*, 384 S.W.2d 643, 650[9] (Mo.1964). "Plaintiff, who put the [records] in evidence, is not 'bound' by the statements in such record . . . . Having put the record in evidence, plaintiff could not impeach it as such, but she could contradict the facts which were related in such record." *Steele v. Woods*, 327 S.W.2d 187, 196–97[14] (Mo. 1959). Such is the case here.

Defendant next argues the evidence was insufficient to prove the injections were given plaintiff "solely" for obesity as assumed in plaintiff's hypothetical question, thus it was error to permit the answer. This contention is not well-taken for several reasons. The answer to the hypothetical question concerning Emmert's negligence appears nonresponsive, as the witness did not confine his answer within the scope of the question asked. The question included the assumed fact that the shots were administered "solely" for an overweight condition. The doctor answered, by stating that use of mercuhydrin for excessive weight is not approved medical practice and somewhat differently, that mercuhydrin was inappropriate treatment for weight reduction. From this the jury could believe that even though the shots may have been intended by Emmert as treatment of "blood pressure" or to "remove fluid," that if "obesity control" was also one of his purposes, such treatment constituted malpractice. Defendant did not object to this apparently nonresponsive answer and once in, plaintiff is entitled to its benefit. Further there was abundant evidence from which the jury could conclude such "fact" had been proved. The negligent conduct of Dr. Emmert occurred in July, 1966, and plaintiff testified she was being treated by him during June, 1966, for a "weight problem."

"Q. Now, were you still being treated by Dr. Emmert in, say, June of 1966?

A. Yes.

Q. For what condition were you being treated at that time?

A. Weight problem."

She further testified that Emmert had put her on a diet for this "weight problem." The questioned shots of mercuhydrin were administered between July 6 and July 21 of 1966, and the thrombophlebitis caused her to consult Dr. Allen Klippel at his office in Clayton, Missouri on July 26, who hospitalized her shortly thereafter. On July 26, Mrs. Depper told Dr. Klippel she was being treated by Dr. Emmert and explained it was for a "weight" condition. Dr. Barrow, who assumed responsibility for her treatment after she was hospitalized testified that Mrs. Depper told him she was seeing Dr. Emmert "because she wanted to lose weight." Mrs. Depper testified on direct examination that the treatment given her on July 13 by Dr. Emmert was for "weight loss, for fluid". The record is replete with testimony that her health problem in 1965 and 1966 was one of obesity. Mrs. Depper gave Dr. Emmert her medical history in May, 1965 and at that time she was overweight; as her husband described it, she was "heavy". Dr. Emmert's records show he followed her serially with weight checks and in September of that year her weight was 181 pounds, in December, 183 pounds and on December 29, 187 pounds. On January 7, 1966, she weighed 189 pounds and stayed around 187 pounds through July of 1966. As previously noted herein, Dr. Emmert told Mr. Depper he had administered "mercuhydrin" to take fluid from Mrs. Depper and "make her slim and trim." This constitutes an admission that the mercuhydrin injection was to "make her slim and trim" to control the obvious overweight condition which he had followed so closely during 1965 and 1966. In the year 1966, her weight was in the 180 to 190 pound range. All of this belies appellant's contention that the evidence was insufficient to permit the jury to find defendant's decedent administered the drug solely for weight loss.

■ In his brief appellant contends the testimony of Mr. Depper, that the doctor administered the mercuhydrin "to take fluid out of her body" indicates conclusively that the drug was not administered solely for weight reduction. This argument ignores the fact that the ultimate purpose of removing fluid and the purpose of administering the mercuhydrin is "to make her slim and trim" which was the direct testimony of plaintiff's witness, Mr. Depper in answer # 2a *supra*. This factual question, too, is one for the jury.

■ Appellant, in a further attempt to impeach the testimony that the mercuhydrin was administered *solely* for weight loss, argues that Mrs. Depper had been seeing Dr. Emmert for *female problems* and not "weight problems". However, a review of the record shows that the instance to which appellant refers concerned consultations in 1950 and again in 1962, some 15 and 4 years respectively, prior and unrelated to the negligent administration of mercuhydrin in 1966. Though appellant argues that somehow the "female problems" occurring in 1950 and 1962 might be connected to the 1966 mercuhydrin injections he does not tell us how or in what manner they are related. Mrs. Depper saw Dr. Emmert in 1965 after he returned to active practice and when asked about the doctor's 1966 treatment of Mrs. Depper, Mr. Depper explained she had a weight problem "at that time". This testimony supports the postulation in the hypothetical question to plaintiff's expert that the mercuhydrin had been administered by Dr. Emmert solely for Mrs. Depper's obesity.

We turn now to defendant's Point I in which he contends there was no showing that Dr. Emmert was negligent in his treatment or that such negligence if any was the proximate cause of plaintiff's thrombophlebitis.

■ As previously discussed, there was sufficient evidence for the jury to find that plaintiff was treated for obesity by three injections of mercuhydrin during July 1966 and these injections were the competent producing cause of the plaintiff's thrombophlebitis. The hypothetical question to plaintiff's expert as to Emmert's negligence inquired if mercuhydrin was appropriate treatment for obesity. He testified it was not. However, the hypothetical question did not ask if mercuhydrin could reasonably

be expected to cause the phlebitis or whether in the exercise of the proper degree of professional skill Dr. Emmert, knowing of plaintiff's pre-existing condition, should have been aware of that possibility and guarded against it. Though this aspect of plaintiff's theory was not included in the hypothetical question, such was not required [2] as the proof was otherwise sufficient to support submission of the issue. There was substantial probative evidence of the following: Emmert had been treating plaintiff from 1945 to 1966; he was aware of her prior experience with phlebitis; he knew or should have known that phlebitis can be triggered by a number of causes; mercuhydrin can produce an adverse allergenic reaction; a treating physician should watch for patient "reaction, expected or unexpected" after administering mercuhydrin; following the first injection of mercuhydrin on July 6, 1966,[3] a readily apparent adverse reaction occurred, yet he gave the second injection; a similar reaction of phlebitis-like symptoms in the leg followed the second shot; still he administered a third and shortly thereafter plaintiff was hospitalized for thrombophlebitis. From this and other evidence, a submissible case was made and we find the trial court did not err in submitting the case to the jury. *Frazier v. Stone,* 515 S.W.2d 766, 767[2] (Mo.App. 1974); *Odum v. Cejas,* 510 S.W.2d 218, 225[5] (Mo.App.1974).

Appellant finally argues that the only measurable quantity of the drug administered as shown by the evidence was one-half c.c. on July 6, 1966. There was evidence and the jury found that three shots of mercuhydrin were administered. Dr. Emmert's records contained the admission that a one-half c.c. shot of mercuhydrin had been administered on July 6, 1966. Dr. Barrow testified that the one-half c.c. shot indicated it was probably a test shot to determine if there was any allergic reaction which is consistent with the fact that Mrs. Depper had a prior history of thrombophlebitis. According to Dr. Barrow, mercuhydrin can produce an allergic reaction in one with a propensity for such condition and following the July 6 shot Mrs. Depper experienced such reaction with thrombophlebitic symptoms in her arm. Nevertheless, Dr. Emmert persisted with another shot on July 13 closely followed by further adverse reaction and another shot on July 20, with even more severe results. Simply put, the quantity of the drug administered appears unimportant because the one-half c.c. triggered the first reaction and the jury could find it was negligent to continue such drug in any amount. Also the second and third shots, regardless of their quantity, disabled the patient.

■ There was sufficient evidence for the jury to find, as it in fact did, that Dr. Emmert was negligent in administering the drug under the conditions here.

■ Defendant's final contention that "the trial court erred in ruling that plaintiff's husband, Earl Depper, was not disqualified as a witness and in permitting him to testify as to conversations with Dr. Emmert" fails to comply with the requirements of Rule 84.04(d), V.A.M.R., in that it fails to state "wherein and why" the court's ruling is erroneous, *Thigpen v. Dodd's Truck Lines, Inc.,* 498 S.W.2d 816, 818[5] (Mo.App. 1973); and defendant's brief fails to cite relevant authorities. *Cox v. Lee,* 530 S.W.2d 273, 275[5] (Mo.App.1975). It preserves nothing for review and is therefore denied.

The judgment is affirmed.

---

**2.** "It is not absolutely essential that a hypothetical question should include all material facts supported by evidence. The questioner may frame his hypothetical question on his own theory and may not necessarily include all the material facts shown in evidence. The questioner may elicit an opinion on any combination or set of facts he may choose, if the question propounded fairly hypothesized facts the evidence tends to prove and fairly presents the questioner's theory so that the answer will be of assistance to the jury on the issue." *Huffman v. Terminal R. R. Ass'n of St. Louis,* 281 S.W.2d 863, 870[9] (Mo.1955).

**3.** Plaintiff's expert testified that the one-half c.c. mercuhydrin administered on July 6 as shown in Emmert's office record, was probably given in that small amount as a test, indicating Emmert's concern with possible adverse reactions.

WEIER, J., dissents in separate opinion.

SIMEONE, C. J., and DOWD, SMITH and GUNN, JJ., concur.

McMILLIAN, J., dissents and concurs in dissent of WEIER, J.

WEIER, Judge, dissents.

I respectfully dissent. In order to support plaintiff's charge of negligence it was necessary for her to adduce evidence of the doctor's treatment, its adverse effect upon plaintiff, expert opinion that the treatment so given caused the condition for which plaintiff seeks damages, and further that the course of treatment violated the standards expected of ordinarily careful, skillful and prudent doctors acting under similar circumstances. *Haase v. Garfinkel,* 418 S.W.2d 108, 113[3, 4] (Mo.1967).

On appeal, defendant contends the trial court erred in refusing to direct a verdict in his favor because there was insufficient evidence to establish that any negligent act or omission of Dr. Emmert caused plaintiff's thrombo-phlebitis. Plaintiff relied upon the testimony of Dr. Jack Barrow who had treated plaintiff after her hospitalization in July, 1966, to prove that Dr. Emmert's treatment was negligent and had caused the recurrence of the thrombo-phlebitis. Defendant contended the evidence did not support the hypothetical questions propounded to Dr. Barrow in that no evidence proved that Emmert had administered three shots of mercuhydrin to Mrs. Depper.

Plaintiff introduced Dr. Emmert's records and read into evidence that portion which established that Dr. Emmert gave Mrs. Depper a one-half c.c. injection of mercuhydrin on July 6, 1966, "for fluid," a 2 c.c. injection of premerin on July 13, 1966, (for female disorders) and a 2 c.c. injection of estrone on July 21, 1966, (also for female disorders). The record contained no reference to mercuhydrin except the one entry on July 6.

Based upon this evidence and the conversation of Mr. Depper with Dr. Emmert related in the majority opinion, plaintiff's counsel then submitted to Dr. Barrow a hypothetical question in which he asked the doctor to assume that Mrs. Depper received three injections of mercuhydrin, one on July 6, 1966, one on July 13, 1966, and one on July 21, 1966, and that he further assume that the sole reason for her treatment at this time was for weight loss. Based on this assumption of facts, plaintiff's expert was of the opinion that mercuhydrin would not be considered an appropriate drug for treatment of excessive weight or obesity; that in giving the three injections of mercuhydrin, Dr. Emmert was not exercising that degree of skill and learning normally exercised by doctors under the same or similar circumstances; and that the injections of mercuhydrin "caused that thrombo-phlebitis suddenly to flare up." In answer to a question as to whether one-half c.c. of mercuhydrin was a sufficient dosage for therapeutic reasons, Dr. Barrow replied: "No. I think that's in the order of a test dose to see that the patient is not going to react to it." Such an amount would have no therapeutic benefit. He had previously explained mercuhydrin was a diuretic enabling the body to get rid of excessive fluid. One undesirable result would be to get hives or skin rashes but usually these would occur after the drug had been used more than once.

Plaintiff's evidence is insufficient to establish that defendant's decedent, Dr. Emmert, administered three shots of mercuhydrin to plaintiff or that the drug was given in any specific quantity and in turn the evidence fails to support the hypothetical questions addressed to plaintiff's expert, Dr. Barrow, and his opinion that establishes Emmert's negligence. With the evidence of Dr. Emmert's records, one cannot logically reason that the jury should be able to infer from the testimony of plaintiff's husband, Mr. Depper, that in his conversation with Dr. Emmert, Emmert admitted giving Mrs. Depper three shots of mercuhydrin. To the contrary, Depper's testimony relates Emmert as stating he had given Mrs. Depper only one shot of mercuhydrin. This conformed exactly to his records. Emmert's further related statement that he had given three shots to plaintiff without specifying

the drugs injected as the quantity thereof did not controvert the records. Reading into this statement an admission that he gave Mrs. Depper three injections of mercuhydrin reaches beyond the bounds of the simple language found in the evidence to find an intendment not there to be drawn. Juries are not permitted to speculate in this manner. *Esmar v. Zurich Insurance Co.,* 485 S.W.2d 417, 421[2] (Mo.1972); *Williams v. Cavender,* 378 S.W.2d 537, 541[2] (Mo. 1964); *Graham v. Conner,* 412 S.W.2d 193, 203[19] (Mo.App.1967); MAI 2.01.

Even if one were to reach the inference plaintiff seeks in Emmert's conversation, plaintiff's evidence points to two equally probable and inconsistent conclusions—that plaintiff was given one shot of mercuhydrin, or that she was given three shots of the drug. In such a situation, plaintiff has again failed to remove the case from the realm of speculation. *Williams v. Cavender, supra,* 378 S.W.2d at 541[4]; *Lewis v. Hubert,* 532 S.W.2d 860, 869[22] (Mo.App. 1975); *Straughan v. Asher,* 372 S.W.2d 489, 493[4] (Mo.App.1963).

Plaintiff introduced the records of Dr. Emmert as a part of her case. It is true that she is not bound by the unfavorable portions of the evidence introduced by her if it is contradicted by other evidence. *Dodwell v. Missouri Pacific Railroad Co.,* 384 S.W.2d 643, 649[9] (Mo.1964); *Steele v. Woods,* 327 S.W.2d 187, 196–97[14] (Mo. 1959). But Emmert's telephone conversation with Mr. Depper, as previously pointed out, does not contradict the records. Plaintiff is therefore bound by the uncontradicted records. *Reece v. Reed,* 326 S.W.2d 67, 71[5] (Mo.1959).

Furthermore, it should be pointed out that the only measurable quantity of the drug administered to Mrs. Depper as shown by the evidence was one-half c.c. on July 6, 1966. Such a small quantity would only be considered a test according to the testimony of Dr. Barrow; and as Dr. Barrow indicated, allergic reactions usually would occur only after the drug was used more than once.

Since the only evidence of negligence and causation was Dr. Barrow's answers to the hypothetical questions and the evidence is insufficient to support the hypothetical questions, it follows that there is an absence of relevant expert medical testimony on the issue of negligence and causation. Even viewing the evidence in the light most favorable to plaintiff, according plaintiff the benefit of all inferences reasonably arising therefrom and disregarding defendant's evidence unfavorable to plaintiff, as we must do when judging the sufficiency of the evidence in this jury-tried case, *Boyd v. Terminal Railroad Ass'n of St. Louis,* 289 S.W.2d 33, 35[1] (Mo.1956); *Wardenburg v. White,* 518 S.W.2d 152, 154[1] (Mo.App.1974), we still find that this necessary part of plaintiff's case is missing. Without relevant expert medical testimony on negligence and causation in a case presenting questions beyond the ability and experience of average laymen, such as the case at bar, plaintiff has not made a submissible case. *Haase v. Garfinkel, supra,* 418 S.W.2d at 112–13[2–4]; *Hart v. Steele,* 416 S.W.2d 927, 931–33[7–10] (Mo.1967); *Kappel v. Slickman,* 401 S.W.2d 451, 453–54[2–4] (Mo.1966).

The judgment should be reversed.