Jesse G. MILLER et al., Respondents,

v.

Stephen G. SCHOLL, Administrator of the Estate of Dr. Earl G. Padfield, Deceased, Appellant.

No. KCD 29929.

Missouri Court of Appeals, Western District.

Feb. 4, 1980.

Ernest H. Fremont, Jr., Wm. Dirk Vandever, Popham, Conway, Sweeny, Fremont & Bundschu, P.C., Kansas City, for appellant.

Phil M. Cartmell, Jr., George P. Coughlin, Gage & Tucker, Kansas City, for respondents.

Before SOMERVILLE, P. J., and PRITCHARD and MANFORD, JJ.

SOMERVILLE, Presiding Judge.

The plaintiffs, husband and wife, sued Stephen G. Scholl, Administrator of the Estate of Dr. Earl G. Padfield, Deceased, in two counts for damages resulting from cataract surgery performed by Dr. Padfield on the husband's right eye. Commencing on September 12, 1977, and concluding on September 16, 1977, the case was tried to a jury which, by separate nine man verdicts, found for the husband and assessed damages in his favor in the amount of $130,000.00 under count one and found for the wife and assessed damages in her favor in the amount of $65,000.00 under count two. The defendant, after unavailing motions for judgment notwithstanding the verdicts and new trial, timely appealed.

Plaintiffs' respective verdict directing instructions each submitted eleven identical acts of purported negligence in the disjunctive ranging from failure to inform the husband of the risks of the cataract surgery to delay in informing the husband of a retinal detachment. Interspersed were submissions of purported negligence predicated upon various surgical procedures either omitted or utilized. The far ranging nature of the eleven disjunctive submissions is disclosed by setting forth one of the verdict directing instructions:

*"INSTRUCTION NO. 3*

Your verdict must be for plaintiff, Jesse G. Miller if you believe:

First Dr. Padfield either:

Failed to inform plaintiff, Jesse G. Miller, prior to his cataract surgery of the dangers to him in the proposed cataract operation, and had plaintiff, Jesse G. Miller, been so informed he would not have submitted to said surgery, or

Informed plaintiff, Jesse G. Miller, that he had a 90–95% chance of success in the proposed cataract operation when his chances were substantially less, and had plaintiff, Jesse G. Miller, been accurately informed he would not have consented to said surgery, or

Failed to take steps prior to the cataract operation to effect orbital decompression by surgery or medication such as glycerin or mannitol so as to reduce the external pressure on his eye, or

Failed to utilize the alternative operative procedure known as phaco emulsification, or

Used a local anesthetic rather than a general anesthetic, or

Failed to perform a leteral canthotomy, or

Advised plaintiff, Jesse G. Miller, to undergo a cataract operation at a time when plaintiff was not sufficiently disabled by the cataract, or

Failed to postpone the cataract operation prior to the incision when, upon massage of the eyeball, he observed that the decompression of the eye was unsuccessful, or

Failed to terminate the cataract operation after the incision, when he observed gaping of the wound incision, or

Failed to utilize appropriate equipment so as to measure and monitor the orbital pressure, or

Did not advise plaintiff of the retinal detachment until May 29, 1973, and, on May 30, 1973 told plaintiff there was nothing that could be done for such condition, and,

Second, Dr. Padfield's conduct in any one or more of the respects submitted in paragraph First was negligent, and

"Third, as a direct result of such negligence plaintiff, Jesse G. Miller, sustained damage."

On appeal defendant asserts (1) that there was a lack of substantial evidence to support nine of the eleven disjunctive submissions, (2) that the respective verdicts were "so grossly excessive as to show bias, passion and prejudice on the part of the jury", and (3) that the respective verdicts "were excessive under the circumstances".

A synoptic view of the evidence is in order before addressing the merits of the issues on appeal. The cataract surgery in question was performed on April 19, 1973, at St. Luke's Hospital, Kansas City, Missouri, by Dr. Padfield, a "board certified" ophthalmologist. The husband's preoperative medical history disclosed that a hyperactive thyroid which he previously suffered from had been chemically rendered inactive in 1969. Before and at the time the cataract surgery was performed the husband had a condition medically known as endocrine exophthalmos (protrusion of the eyeballs), which was symptomatic of his inactive thyroid. Edema of the eyelids (puffiness) was a manifestation of the endocrine exophthalmos which had beset the husband. These conditions were known by Dr. Padfield by reason of a preoperative examination of the husband. Evidence was introduced that these conditions elevated the risks attending cataract surgery.

The preoperative examination of the husband also disclosed cataracts on both eyes which reduced the visual acuity of the right eye to between 20/60 and 20/70 and the visual acuity of the left eye to 20/40. The cataract on the right eye of the husband, having been diagnosed as most severe, was selected first for cataract surgery. The surgical procedure utilized by Dr. Padfield to remove the cataract from the husband's right eye was described as a "standard cryophake delivery". In layman's language a cataract is a clouding of the lens of the eye and its eradication is accomplished by

removing the lens of the affected eye. The evidence disclosed that a "standard cryophake delivery" utilizes a small instrument described as "a cold probe", which, when placed on the anterior surface of the lens of the eye forms an "iceball", thereby securing the lens to the "cold probe" and permitting the lens to be "pulled out of the eye".

In order to reach the lens of the husband's right eye with the "cold probe" a local anesthetic was administered. After the anesthetic was injected Dr. Padfield massaged the right eye with his fingers for approximately five minutes in order to disperse the anesthetic and thereby make the eyeball more numb, less mobile, and softer; and also for the purpose of decreasing the protrusion of the eyeball. The pressure applied during the massage was "largely unsuccessful" in overcoming the minimal protrusion of the eyeball caused by the endocrine exophthalmos condition, all of which indicated some degree of extraocular pressure on the eyeball. Sutures were then placed in the eyelids to hold them open and to position the eye for surgery. The cornea of the eye was then indented with a muscle hook. On doing so, the cornea dimpled easily. This indicated that the eye was soft and that no excessive intraocular pressure was present. An ab externo incision was then made at the 12:00 o'clock position where the sclera (the "white of the eye") and the cornea (a "transparent structure" covering the iris) meet. By way of explanation, an ab externo incision refers to an incision which is made by a series of small "scrapes" on the surface with a sharp instrument thereby effecting a slow entry and gradually, as opposed to suddenly, exposing the inner eye to atmospheric pressure. The ab externo incision was then lengthened to the horizontal on each side by the use of surgical scissors. After the ab externo incision had been lengthened the "wound" gaped, meaning, that the lips of the "wound" began to separate. This was suggestive of a hemorrhage inside the eye and the "wound" was temporarily sutured at the point of the gape. A lid speculum was then employed to lift the eyelids from the eye to reduce any pressure that they might be exerting on the eye. Dr. Padfield recognized the gaping as presenting a serious problem and injected 800 cc's of twenty percent Mannitol solution to dehydrate the eyeball and the orbit in which it rested in order to reduce any pressure. After waiting for the Mannitol solution to take effect, the temporary suture was loosened and it was observed that the gaping had been reduced. A peripheral iridectomy was then performed, i. e., a small incision was made in the iris of the eye. This was done to prevent a form of secondary glaucoma. Sometimes it also effects a reduction of intraocular pressure. The eye was then irrigated with Zolyse to weaken the minuscule ligaments which held the lens in place. Untied sutures were then inserted for quick closing of the wound after the lens was removed. The "cold probe" was then inserted and the lens was extracted. As the lens was being extracted the vitreous of the eye extruded and a "grey tissue" was observed in the eye. The earlier gaping of the "wound", the extrusion of the vitreous, and the "grey tissue" observed suggested an explusive (the rapidity with which it occurs) choroidal hemorrhage. In turn, they also suggested excessive intraocular pressure. According to the evidence explusive choroidal hemorrhages are rare and their incidence of occurrence during cataract surgery is less than one percent. The extruded vitreous was removed from the wound by means of a "Gass asperator" and a "Weck-cel Sponge". A "stab" incision was made in the sclera (the white of the eye) and a needle was inserted in an attempt to evacuate any hemorrhage, but no noticeable result was achieved. The wound was closed with sutures and the operation was completed. Dr. Padfield suspected a retinal detachment in the operated eye on May 22, 1973, and on May 29, 1973, so advised the husband and recommended that he see a retina specialist. The husband did so and surgery was subsequently performed by a retina specialist for repair of the detached retina. The surgery for the detached retina, although not completely successful, did improve the vision of the hus-

band's right eye opposed to what it had been following the cataract surgery.

The husband testified that Dr. Padfield did not tell him before cataract surgery was performed on the right eye that the normal 90 to 95 percent chance for success was reduced by the endocrine exophthalmos which he suffered from. On the other hand, there was evidence that the endocrine exophthalmos reduced the chance of success from 15 to 20 percent. An admission attributed to Dr. Padfield that an adverse result was obtained from the cataract surgery performed on the husband's right eye was offered by the plaintiffs and admitted into evidence without objection. Other evidence will subsequently be assimilated into this opinion as may be deemed appropriate and necessary.

■ The exigencies of time and space do not favor a protracted discussion of the relationship of the evidence to each of the nine disjunctive submissions questioned by defendant. Moreover, doing so is unnecessary from a dispositional standpoint because if any one of the nine disjunctive submissions lacks requisite evidentiary support the respective verdict directing instructions are rendered defective and erroneous and reversal and remand of the case for a new trial is the available curative remedy. *Cook v. Cox*, 478 S.W.2d 678 (Mo.1972); and *Bunch v. McMillian*, 568 S.W.2d 809 (Mo. App.1978). See also "Notes on Use" appended to MAI 17.02 [1977 Revision].

One of the nine disjunctive submissions attacked by defendant as being unsupported by sufficient evidence, which was common to both verdict directing instructions and fourth in numerical order, reads as follows: "Failed to utilize the alternative operative procedure known as phaco emulsification, or . . . ". Before the sufficiency or insufficiency of the evidence to support this particular disjunctive submission is assessed a legal template for doing so should be cut.

■ As stated in *Bunch v. McMillian, supra*, 568 S.W.2d at 811, in analyzing the evidence in the frame of reference present-ed, the plaintiffs are "entitled to the benefit of the most favorable combination of facts which reasonably may be inferred from all of the evidence so long as such facts do not conflict with . . . [plaintiffs'] basic theory of the case or with . . . [their] own judicial admissions." When a patient in a medical malpractice case charges that the skill and technique exercised by a surgeon constituted negligence "it is usually necessary to prove by expert testimony from members of that profession that the skill or technique used did not conform to the standards of the profession." *Steele v. Woods*, 327 S.W.2d 187, 199 (Mo.1959). Of like tenor are *Williams v. Chamberlain*, 316 S.W.2d 505, 511 (Mo.1958), and *Pedigo v. Roseberry*, 340 Mo. 724, 102 S.W.2d 600, 606 (1937). The recognized exception to the rule just mentioned, which does not come into play in this case, is that whenever the skill or technique involves a matter within the knowledge of laymen, and is therefore not exclusively within the knowledge of members of the profession, expert testimony from members of the profession that the skill or technique did not conform to the standards of the profession is not essential. *Steele v. Woods, supra*, 327 S.W.2d at 199. This exception, properly so, is tightly circumscribed because "[i]f laymen are not to be guided on issues requiring peculiar and thorough special training in a science or art beyond the experience and knowledge common to mankind by witnesses possessing the necessary testimonial qualifications, juries will be cast into a river of doubt and must establish an arbitrary standard of their own founded upon conjecture and surmise in their effort to reach certain and sure ground." *Pedigo v. Roseberry, supra*, 102 S.W.2d at 607.

■ Peripherally, a "very heavy burden" is assumed by a plaintiff in a medical malpractice action when negligence is predicated on the "technique" exercised by an operating surgeon "or on a charge that he failed to exercise reasonable judgment". *Williams v. Chamberlain, supra*, 316 S.W.2d at 511, quoting from *Hopkins v. United States*, 152 F.Supp. 473 (W.D.Mo.1957). Members of the medical profession are "en-

titled to a wide range in the exercise of . . . [their] judgment and discretion and . . . [can] not be found guilty of negligence 'unless it be shown that the course pursued was clearly against the course recognized as correct by the profession generally. . . .' " *Haase v. Garfinkel*, 418 S.W.2d 108, 114 (Mo.1967). No presumption of negligence is indulged in a medical malpractice action by reason of an adverse result. *Swope v. Printz*, 468 S.W.2d 34, 39 (Mo.1971), and *Hart v. Steele*, 416 S.W.2d 927, 931 (Mo.1967). Notwithstanding an adverse result, a plaintiff in a medical malpractice action continues to bear the burden of proving that the averred negligent conduct of a physician or surgeon deviated from the requisite standard of care. *Swope v. Printz, supra*, 468 S.W.2d at 39. Whether a physician or surgeon's conduct did or did not measure up to the requisite standard of care must be determined in light of facts existing and known by them at the time in question, rather than on the basis of facts revealed by subsequent developments. *Mackey v. Greenview Hospital, Inc.*, 587 S.W.2d 249, 254 (Ky.App.1979); *Engle v. Clarke*, 346 S.W.2d 13, 17 (Ky.App. 1961); and 70 C.J.S. Physicians and Surgeons § 48, p. 961.

█ The jury in this case was instructed as to the requisite standard of care by the giving of MAI 11.06 [1977 Revision],[1] adopted and approved May 23, 1977, effective January 1, 1978. Said instruction (No. 5) was given at the request of plaintiffs and no objection has been lodged against it by defendant on appeal. Parenthetically, the order adopting and approving MAI 11.06 [1977 Revision] expressly provided that its use prior to the January 1, 1978, effective date "shall not be presumed to be error". MAI, 1978 Pocket Part, p. XVI. Instruction No. 5 reads as follows:

## "INSTRUCTION NO. 5

The term 'negligent' or 'negligence' as used in these instructions means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of Dr. Padfield's profession."

It is highly appropriate to note at this point that mere evidence that the conduct of a physician or surgeon did not measure up to the standards of a single member of the profession, as opposed to the standards of the profession as a whole, does not constitute sufficient evidence to support a submission of negligence in a medical malpractice action for the basic and fundamental reason that the standards of a single member of the profession may be higher or lower than the standards of the profession as a whole. *Swope v. Printz, supra*, 468 S.W.2d at 41.

In order to determine whether there was sufficient evidence to support the disjunctive submission that defendant "[f]ailed to utilize the alternative operative procedure known as phaco emulsification", the legal template heretofore cut will be superimposed upon the evidence presented to the jury. Before engaging in this all important task, a brief explanation of the procedure known as phacoemulsification is in order. A "rather elaborate" piece of equipment is required to extract a cataractous lens by the procedure known as phacoemulsification. Basically, the equipment was described as a probe "containing an irrigating and aspirating cannula . . . [with] a tip that goes 'buzz' . . . [which] fragments the lens." The fragmented lens is then "aspirated" by the "rather elaborate" piece of equipment. A less generous incision is required to insert the "probe" or "tip" of the phacoemulsification equipment than is required to insert the probe used in a "standard cryophake delivery". The less generous incision employed in the phacoemulsification procedure, and the filling of the less generous incision "with the aspirator-irrigator tip, perhaps . . . could maintain the innerocular pressure better

1. The "Committee's Comment" to MAI 11.06 [1977 Revision] reads as follows: "This instruction conforms to the court's holding in *Gridley v. Johnson*, 476 S.W.2d 475 (Mo.1972) where the court approved of the deletion from the former instruction of the words 'in good standing' and did away with the locality rule in medical malpractice cases."

. . .". According to the record, on April 17, 1973, the date of the operation in question, the phacoemulsification procedure was in its infancy and there was no phacoemulsification equipment in Kansas City, Missouri, at that time. According to the testimony of one expert medical witness, which stands undisputed, it would have been impossible to have performed cataract surgery in Kansas City in 1973 by the phacoemulsification procedure because the "rather elaborate" piece of equipment necessary to do so was unavailable.

Discussion of the phacoemulsification procedure first crept into this case in connection with evidence pertaining to a weekly "Wednesday morning eye conference" held on June 6, 1973, in the Ophthalmology Department of the University of Kansas Medical Center, Kansas City, Kansas. These weekly conferences are attended by various ophthalmologists in the metropolitan area, staff members of the Ophthalmology Department of the University of Kansas Medical Center, medical residents and students. At the June 6, 1973, conference the adverse result obtained from the cataract operation performed on the husband's right eye was discussed in the context of suggesting possible alternate procedures that might be employed in the event the husband submitted to cataract surgery in the future for his left eye. Among the possible alternative procedures suggested in the event the left eye was subjected to surgery were "orbital decompression", "general anesthesia", "softening agents", and "phacoemulsification". The only other evidence pertaining to the phacoemulsification procedure came from two ophthalmologists who appeared as expert medical witnesses, one by way of deposition[2] for the plaintiff and the other in person for the defendant. At one point, the plaintiff's expert medical witness testified that he didn't know whether the phacoemulsification procedure was a "viable alternative" in 1973. At another point this same witness in response to a question posited on the use of the phacoemulsification procedure, prefaced his answer as follows:

"Well, of course, knowing what happened to Mr. Miller, it would probably be the preferred treatment at this point, but in most surgeon's hands the standard cataract operation is as successful as the phacoemulsification procedure if both are done with skill." By way of reiteration for the sake of emphasis, the requisite standard of care must be determined in light of facts existing and known at the time in question, rather than on the basis of facts revealed by subsequent developments. *Mackey v. Greenview Hospital, Inc., supra; Engle v. Clarke, supra* ; and 70 C.J.S. Physicians and Surgeons § 48, p. 961, *supra.* The ophthalmologist called as an expert witness by defendant, on cross-examination by counsel for plaintiffs, in response to a question prefaced by "If he [the husband] had been your patient, what would you do?", listed a number of alternative procedures, one of which was phacoemulsification. Again by way of reiteration for the sake of emphasis, the standard of care that a single ophthalmologist would have comported with is insufficient to support a submission of negligence in a medical malpractice case because the standard of care of a single ophthalmologist may be higher or lower than the standard of ophthalmologists collectively as a profession. *Swope v. Printz, supra.*

■ After superimposing the previously cut legal template on the evidence presented to the jury in this case there is but one ineluctable conclusion to be drawn—there is not so much as a scintilla or hint of evidence at the time cataract surgery was undertaken on the husband's right eye, under existing facts then known as opposed to facts revealed by subsequent developments, that Dr. Padfield's failure to utilize the alternative operative procedure known as phacoemulsification failed to measure up to the degree of skill and learning ordinarily used under the same or similar circumstances by the members of Dr. Padfield's profession. This disjunctive alternative submission, at best, had only speculation, conjecture and surmise to cling to for support, and cases are legion holding that verdict

2. The deposition was taken on December 29, 1976.

directing instructions supported by nothing more than the vagaries of speculation, conjecture and surmise are fatally erroneous. The evidentiary infirmity of this particular disjunctive submission becomes even more pronounced when one considers that it was predicated upon Dr. Padfield's alleged failure to utilize a procedure which was in the cradle stage of use and required a "rather elaborate" piece of equipment which was unavailable in Kansas City at the time in question.

The rampant scope of the disjunctive submissions contained in the verdict directing instructions given by the court at the request of plaintiffs in this case points up the continuing necessity of exercising legal discipline to resist the temptation of engaging in instruction overkill. It is deemed unnecessary to separately discuss the remaining disjunctive submissions called into question by defendant. This court's failure to do so should not be construed as indicative, one way or the other, as to the sufficiency or insufficiency of the evidence to support the other disjunctive submissions. Upon retrial, the evidence then at hand, vis-a-vis the legal template heretofore cut, should be carefully analyzed to determine which of the multitudinous allegations of negligence may or may not be sufficiently supported by the evidence to justify their incorporation into any contemplated verdict directing instructions.

Defendant's two remaining points on appeal, both directed toward the amounts of the verdicts, have been rendered moot by reason of having found that the disjunctive submission which this opinion centered upon, and which was common to both verdict directing instructions, lacked evidentiary support.

Judgment reversed and cause remanded for a new trial.

All concur.