942 F.Supp. 1220 (1996)
William F. BOYCE and Josephine M. Boyce, Plaintiffs,
v.
UNITED STATES of America, Defendant.
No. 4:91 CV 2357 DDN.
United States District Court, E.D. Missouri, Eastern Division.
September 16, 1996.
Order Entering Amended Judgment October 29, 1996.
*1221 *1222 Leonard P. Cervantes, Cervantes and Associates, St. Louis, MO, for plaintiffs.
Eric T. Tolen, Asst. U.S. Attorney, Office of U.S. Attorney, St. Louis, MO, for defendant.

OPINION
NOCE, United States Magistrate Judge.
This action is before the court following a non-jury trial. Plaintiffs William F. Boyce and Josephine M. Boyce, his wife, have brought this judicial action against the defendant United States under the Federal Tort Claims Act ("the Act"), 28 U.S.C. §§ 2671 et seq. The parties consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c)(3). This court has subject matter jurisdiction over the action under 28 U.S.C. § 1346(b).
Plaintiffs' complaint alleged two counts for relief and seeks substantial monetary damages. In Count I of their complaint, plaintiffs alleged that physicians employed by the United States at a Veterans Administration hospital in St. Louis, Missouri, rendered plaintiff William Boyce negligent medical care by (1) failing to perform appropriate diagnostic tests to detect the true nature of the cancerous growth on his left wrist before unnecessarily amputating his arm below the elbow and (2) by failing to excise the cancerous tissue in a timely manner, to avoid the unnecessary amputation later performed. In Count II plaintiff Josephine Boyce seeks damages for loss of consortium.

Administrative claim procedures.
The parties agree that the court has subject matter jurisdiction over William Boyce's claims, because he satisfied the requirement of the Act that he pursue an administrative claim before he resorted to a judicial action, such as this. See 28 U.S.C. § 2675(a); Manko v. United States, 830 F.2d 831, 838 (8th Cir.1987).
In a pretrial motion to dismiss, defendant argued, however, that the Count II claim of plaintiff Josephine M. Boyce for loss of consortium should be dismissed, because she failed to present to the Veterans Administration an administrative claim for her damages. See 28 U.S.C. § 2675(a). Plaintiffs argued that the Act requires only that plaintiffs put the United States on notice of Josephine's claim so to enable it to investigate it, citing Shelton v. United States, 804 F.Supp. 1147, *1223 1154 (E.D.Mo.1992). During the course of the trial, the motion of the defendant to dismiss the claim of Josephine Boyce was denied by the court. Following the non-jury trial, the United States reasserts its arguments for the dismissal of Mrs. Boyce's claim for loss of consortium.
The arguments of the United States remain viable for consideration, because they involve the subject matter jurisdiction of the court which can be considered or reconsidered at any time. See Fed.R.Civ.P. 12(h)(3).
For this court to have subject matter jurisdiction over the claim of Mrs. Boyce in this action for loss of consortium, Congress has required that she present her claim, in timely fashion, to the Veterans Administration before bringing suit in this court. 28 U.S.C. § 2675(a). The purpose of the Act's presentment requirement is to encourage administrative consideration and settlement of the claim. See Shelton v. United States, 804 F.Supp. at 1154. To properly present the claim to the agency, the claimant must provide "in writing sufficient information (1) sufficient information for the agency to investigate the claims ..., and (2) the amount of damages sought...." Farmers State Savings Bank v. Farmers Home Administration, 866 F.2d 276, 277 (8th Cir. 1989).
The relevant facts are that plaintiff William F. Boyce filed his written claim with the Veterans Administration on September 26, 1990. See Claim for Damage, Injury or Death, Gov.Exh. B, filed November 3, 1994. On that claim form, William Boyce described his claim, stating his loss as the loss of his left forearm, and stating the amount of the claim as $3,000,000. Id. Following the filing of William Boyce's administrative claim, the Department of Veterans Affairs, by letter dated October 19, 1990, wrote plaintiffs' counsel and requested specific information about William's claim. Specifically, the letter also requested, in relevant part:
5. If claim is being made for loss of consortium, please provide elements of damages thereunder and applicable documentation;
See Letter dated October 19, 1990, from Assistant District Counsel to plaintiffs' counsel at 1, filed November 14, 1994. In response to this letter, plaintiffs' counsel wrote the Department of Veterans Affairs in relevant part as follows:
5) This pertains to a loss of consortium claim. In this regard, we have included an affidavit from Mrs. Boyce which states the essential elements and her damages for loss of consortium.
See Letter dated May 24, 1991, from plaintiffs' counsel to Assistant District Counsel at 2, filed November 14, 1994. The sworn, written, signed affidavit of Josephine Boyce was submitted, within the two year statute of limitations, and it described at length the factual bases of her asserted loss of consortium, although it did not claim a specific, separate amount of damages due her. See Affidavit of Josephine Boyce, dated May 17, 1991, filed November 14, 1994.
In a letter dated June 12, 1991, the Department of Veterans Affairs formally denied William's claim. The denial letter also offered to settle the matter instead of proceeding to judicial litigation, stating, "In addition, there is the potential of substantial litigation costs to both sides, and non-constructive residuals should claimants proceed to litigation." See Letter from Department of Veterans Affairs, dated June 12, 1991, at 2, filed November 14, 1994 (emphasis of plural form added). No other written denial of Josephine's claim was issued by the government. Plaintiffs invoke the provision of 28 U.S.C. § 2675(a) that the failure of the government to act on her claim within six months of the claim being filed is deemed a denial of her claim to satisfy the administrative claim requirement of the Act.
In the context of these administrative proceedings, plaintiffs communicated to the United States the fact that Josephine Boyce sought relief for her loss of consortium, and in subsequent correspondence the government indicated that it considered her to be a claimant, by implication for a portion of the $3,000,000 set out in William's claim form. Where as here the claimant and the basis for the claim are shown, where the United States considered her claim in its settlement *1224 considerations, and where a specific amount of money claimed originally by one claimant is stated as being applicable to both, the inescapable conclusion is that, as the government considered, Josephine's administrative claim was comprised of William's claim form and Josephine's affidavit. Considering these documents in this fashion, Josephine M. Boyce has exhausted her administrative claim remedy and the jurisdictional requisites of the Act have been satisfied. Cf., Hilburn v. United States, 789 F.Supp. 338 (D.Haw.1992).

Amendment of the complaint.
During the trial of this action, plaintiffs offered evidence that the government physicians incorrectly diagnosed the cancerous condition of William's wrist, even after being advised of the correct diagnosis by the Armed Forces Institute of Pathology and by Dr. Louis Dehner, a respected local physician. Defendant argues that plaintiffs' current allegation of this specification of negligence should not be considered by the court, because it did not consent to any amendment of the complaint pursuant to Federal Rule of Civil Procedure 15(b). The court will consider this aspect of the plaintiffs' case.
At trial, plaintiffs offered the oral testimony of Dr. Richard Johnston, the physician who performed the July 1989 excisional biopsy of the tumor and the September 1989 amputation. He testified that he considered the report provided by the Armed Forces Institute of Pathology (AFIP) in diagnosing plaintiff's condition. He testified that he never was provided the opinion of Dr. Dehner. Defendant did not object to this testimony.[1]
Defendant did not object either to the testimony of Dr. Dennis Citron, plaintiffs' board-certified, medical oncologist expert. Dr. Citron testified, in part, without objection[2] by defendant about the propriety of the actions of Dr. Johnston in disagreeing with the report of the AFIP.
Dr. Louis Dehner also testified for the plaintiffs without objection about the opinions he formed prior to the amputation of plaintiff's arm and to whom he communicated those opinions.
Following the receipt of plaintiffs' evidence, the trial was continued four months and resumed with the receipt of the defendant's evidence. This evidence included the testimony of Dr. Charles Sutherland, a physician who also was involved in the treatment of plaintiff William Boyce. He testified for the defense about the receipt of the AFIP report and about the propriety of Dr. Johnston's actions following receipt of this information.
Defendant's evidence also included the testimony of Dr. Lawrence Creswell, who from June 1988 to the present has been on the staff of Washington University. He was a member of the team of residents who provided medical services to the Veterans Administration. Dr. Creswell's testimony describing what he had recently learned about the appropriate treatment of sweat gland carcinoma was objected to by the plaintiffs as not being previously disclosed; the court took the objection with the case and now sustains the objection.
Finally, in the defendant's case, Dr. Johnston testified about the diagnostic information he had in September 1989 and about his reasons for performing the amputation.
Defendant's post-trial objection, that it has not consented to the addition to the case of the plaintiffs' claim that Dr. Johnston did not act properly with at least the AFIP diagnosis, is without merit. This claim has been *1225 factually in the case from the beginning. Plaintiffs offered opinion evidence about it in their case-in-chief without objection. The defendant also offered opinion evidence about it in its case-in-chief. Upon this record, the complaint has been constructively amended by the implied consent of the defendant. Farmland Indus., Inc. v. Morrison-Quirk Grain Corp., 54 F.3d 478, 481 (8th Cir.1995); Herrera v. Valentine, 653 F.2d 1220, 1223 (8th Cir.1981); St. Joe Minerals Corp. v. Occupational Safety and Health Review Commission, 647 F.2d 840, 844 (8th Cir. 1981). In the circumstances of this case, there is no prejudice to the defendant by the amendment.

Applicable law on merits of case.
Under the Federal Tort Claims Act, the court must apply the substantive law of Missouri to reach final judgment. 28 U.S.C. § 1346(b); Richards v. United States, 369 U.S. 1, 10, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962); United States v. Johnson, 853 F.2d 619, 622 (8th Cir.1988); Lewis v. United States, 663 F.2d 818, 819 n. 2 (8th Cir.1981).
The standard of care for health care providers in Missouri requires that they use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of the defendant's profession generally. See Hurlock v. Park Lane Medical Center, Inc., 709 S.W.2d 872, 882-83 (Mo.Ct.App.1986); Baltzell v. Van Buskirk, 752 S.W.2d 902, 908 (Mo.Ct.App. 1988); Missouri Approved Jury Instruction 11.06 (1990). The standard is not limited to the quality of services delivered by medical care providers who are "in good standing" or who work in a specific locality. See Hurlock, 709 S.W.2d at 883; Gridley v. Johnson, 476 S.W.2d 475, 481 (Mo.1972).
When a patient in a medical malpractice case charges that the skill and technique exercised by a physician or surgeon constituted negligence "it is usually necessary to prove by expert testimony from members of that profession that the skill or technique used did not conform to the standards of that profession." Steele v. Woods, 327 S.W.2d 187, 199 (Mo.1959). See also Williams v. Chamberlain, 316 S.W.2d 505, 511 (Mo.1958); Pedigo v. Roseberry, 340 Mo. 724, 102 S.W.2d 600, 606 (1937); and Miller v. Scholl, 594 S.W.2d 324, 328 (Mo. App.1980). The exception to the requirement of proof by expert testimony from members of the medical profession in a medical malpractice case occurs when the act of negligence relied on involves a matter which is within the knowledge of laymen and is not within the exclusive knowledge of members of the medical profession. Steele v. Woods, supra, 327 S.W.2d at 199. This exception, however, is tightly circumscribed in order to guard against the danger of permitting lay jurors to establish arbitrary standards relative to matters beyond their common experience and knowledge and to decide crucial issues upon nothing more than speculation, conjecture and surmise. Haase v. Garfinkel, 418 S.W.2d 108, 113 (Mo.1967); and Pedigo v. Roseberry, supra, 102 S.W.2d at 607-08.
Members of the medical profession are "entitled to a wide range in the exercise of [their] judgment and discretion and [can] not be found guilty `unless it be shown that the course pursued was clearly against the course recognized as correct by the profession generally....'" Haase v. Garfinkel, supra, 418 S.W.2d at 114. No presumption of negligence is indulged in a medical malpractice case by reason of an adverse result. Swope v. Printz, 468 S.W.2d 34, 39 (Mo.1971); and Hart v. Steele, 416 S.W.2d 927, 931 (Mo.1967).
... Mere evidence that the conduct of a physician or surgeon did not measure up to the standards of an individual member of the profession, as opposed to the standards of the profession at large, does not constitute substantial evidence of probative force to support a submission of negligence in a medical malpractice case as individual standards may be higher or lower than the standards of the profession as a whole. Swope v. Printz, supra, 468 S.W.2d at 41; and Miller v. Scholl, supra, 594 S.W.2d at 329.
Id., 709 S.W.2d at 883-84.
The determination of whether a medical care provider was negligent in diagnosing or advising a course of treatment *1226 must be made in light of the conditions as they existed prior to the treatment, not in the 20/20 vision of hindsight. Gottschall v. Geiger, 207 Mo.App. 89, 231 S.W. 87 (1921). A physician who possesses and exercises the requisite degree of skill does not act negligently by making an honest error in judgment. Fisher v. Wilkinson, 382 S.W.2d 627 (Mo.1964).

Findings of Facts and Conclusions of Law
Following the non-jury trial, the court makes the following findings of fact and conclusions of law:
1. William F. Boyce[3] was born on January 29, 1920. His formal education ended in the eighth grade. He is a veteran of the United States Air Force from which he was discharged in 1945. He has resided in Missouri since his military discharge. He and Josephine Boyce have been married since January 7, 1943.
2. William Boyce became a plumber after his discharge from the military, receiving his technical training "on the job." He retired in 1982 at the age of 62.
3. On February 12, 1988, Boyce went to the John Cochran Medical Center (JCMC), operated by the United States Veterans Administration in St. Louis, Missouri. In the past, plaintiff, who is diabetic, frequently went to JCMC for evaluation and treatment. On February 12, he complained of pain in his left wrist. JCMC provides medical services and participates in the physician educational programs of the Saint Louis University School of Medicine and the Washington University School of Medicine, both in St. Louis. By contract, the Washington University Medical Center provides JCMC with physicians in training, not board-certified physicians, who provide medical services to JCMC patients.[4]
4. During the visit of February 12, 1988, an x-ray of plaintiff's left wrist was taken. The report indicated that the wrist was not broken; however, soft tissue swelling was seen on the back of the wrist. (M.R. 304).[5] On February 12 the surgery clinic physician's assistant sent plaintiff for a consultative evaluation. On February 26, 1988, the report of this consultation was: "Needs Ortho eval. Have arranged for today." (M.R. 377.)
5. On February 26, 1988, he was examined by the JCMC Department of Orthopedics. At that time he complained of a painful, growing mass on his left wrist. On that day, plaintiff was sent to the general surgical clinic for evaluation of the mass.
6. On March 10, 1988, plaintiff was seen at JCMC by Dr. Richard Johnston, a senior resident, and Dr. Gregory Jones, a junior resident. The determined plan was to obtain a bone scan, blood analysis, and x-rays. On that day, the tissue mass measured 2 × 4 cm. Dr. Johnston, who had not yet received the results of the bone scan taken that day, noted that x-rays of the wrist, taken that day, were negative and that the mass appeared to be a ganglion cyst.[6] He indicated in the progress notes that he would try to schedule the plaintiff for removal of the mass in the out-patient clinic the following week. (M.R. 370-71.) The results of the bone scan revealed findings which were "most consistent with a vascular soft tissue mass in the dorsum of the left wrist." (M.R. 292.)
7. On April 21, 1988, another bone scan was taken of plaintiff's left wrist. The clinical evaluation indicated that the mass was a ganglion cyst. However, Dr. Pruitt, a senior resident, noted that the results of the scan indicated more "uptake"[7] than was expected *1227 for such a cyst. Noting that plaintiff wanted the mass removed, he stated that he intended to discuss the matter with the attending physician. In the meantime, he scheduled plaintiff to return to the hospital in two months. (M.R. 375.) The next recorded JCMC consideration of plaintiff's left wrist occurred on June 10, 1988.
8. Dr. Dennis Citron, a board-certified medical oncologist, testified at trial that, within a short time after the JCMC medical staff (i.e. Dr. Pruitt) became suspicious of the mass on plaintiff's wrist, the appropriate physician(s) should have[8] made an excisional biopsy of the mass. By April 1988, the continued presence of the mass and suspicious characteristics were noted. Dr. Citron testified that a single, suspicious lump requires adequate diagnosis, by way of adequate biopsy, quickly. The court does not find and conclude that the JCMC physicians performed below the required standard of care by failing to perform an excisional biopsy of the tissue mass before June 1988. Up to June 1988 the tissue mass could have been adequately biopsied by excision, it could have been diagnosed as the sweat gland cancer it later proved to be, it was small enough to have been excised completely, and plaintiff could have been followed up with appropriate therapy to protect against recurrence of the cancer at that location. However, the failure to so biopsy and excise the mass prior to June 1988 did not allow a condition to develop in which successful excision and therapy thereafter, in lieu of amputation, would have been rendered unavailable. From April 1988 to September 1989, the JCMC staff was concerned about the mass and was continuing to obtain data about its nature.[9]
9. On June 8, 1988, plaintiff was admitted to JCMC for a presumed left inguinal hernia; however, examination indicated that he did not have a hernia condition. On that day the mass on his left wrist was again examined. Also, on that day, a chest x-ray was taken; the results of the x-ray indicated that he was suffering from a mild cardiomegaly and a twisting of the aorta. (M.R. 27, 41.)
10. On June 10, 1988, plaintiff was noted as having a left wrist mass 2 × 3 cm. in size, firm, minimally mobile and mildly tender over the dorsal radius. He was to be evaluated when his clinical records were located. (M.R. 21, 31.)
11. On June 23, 1988, the mass was noted to have increased in size since the date of his bone scan. Plaintiff was placed on a list for surgery. (M.R. 375.)
12. On July 1, 1988, the tissue mass was described as a hard lesion. His wrist exhibited a decreased range of motion. (M.R. 382.)
13. On October 30, 1988, plaintiff suffered a right side cerebral stroke. (M.R. 392.) The effects of plaintiff's stroke did not delay significantly the delivery of medical services to plaintiff for the tissue mass on his left wrist.
14. On November 4, 1988, JCMC scheduled plaintiff for an out-patient surgical biopsy of his wrist in December 1988. (M.R. 393.)
15. On December 16, 1988, plaintiff was seen in the neurology department. He was then suffering from a mild stroke.
16. On December 20, 1988, the left wrist tissue mass was reported as being as large as a golf ball. According to the medical records, plaintiff was under the impression that the JCMC physicians were going to remove the mass on this date. The surgery was not held that date. A plan was noted which included an MRI and plaintiff was scheduled to return the first week of February. (M.R. 399.)
17. On January 25, 1989, an MRI examination was conducted. However, because *1228 plaintiff could not hold himself still enough, the results of the test were not of diagnostic quality. The report of this procedure indicated the medical staff suspected that the mass on plaintiff's wrist might be gangrene. (M.R. 293, 399.) On February 2, 1989, plaintiff's wrist was noted to be a mobile mass, bluish in color. (M.R. 399.)
18. On February 3, 1989, a needle biopsy of the mass on the left wrist was conducted. The February 8, 1989, report stated that the biopsy did not reveal evidence of malignancy; the report indicated the possibility that the mass was synovial[10] tissue hyperplasia[11] or a benign neoplasm[12] arising from synovial tissue. (M.R. 296.) No excisional biopsy of the mass was conducted until July 12, 1989.
19. In agreement with the testimony of Dr. Citron, the court finds and concludes that the failure of the JCMC physicians to conduct an excisional biopsy shortly after receiving the non-malignant needle biopsy report of February 1989 was the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by medical physicians and surgeons generally. This finding and conclusion is reached, because:
a. The March 10, 1988, bone scan revealed findings which were "most consistent with a vascular soft tissue mass in the dorsum of the left wrist." Vascular soft tissue mass is suggestive of cancer requiring additional diagnostic procedures.
b. The size of plaintiff's tumor continued to grow from 2 × 4 centimeters at the initial examination, to "golf ball size" on December 20, 1988.
c. The MRI conducted on January 25, 1989, was not of diagnostic quality and the procedure was not repeated at that time.
d. An excisional biopsy and additional analysis of the tissue mass, if conducted following the negative needle biopsy of February 3, 1989, would have yielded a diagnosis of sweat gland carcinoma.
Had the physicians correctly learned as early as February or March 1989 that the mass was a sweat gland tumor, a successful wide excision of the tumor might have been made shortly thereafter which would have made unnecessary the amputation which was performed in September 1989. Even as late as the September 1989 surgery, the tumor had not invaded the bony structure of plaintiff's wrist.
20. On March 1, 1989, another bone scan was conducted. The report stated that there was no evidence of neoplasm invading the bone. (M.R. 65.)
21. On March 2, 1989, surgery was postponed and another MRI was scheduled. (M.R. 69.)
22. On March 23, 1989, plaintiff was hospitalized for the effects of another cerebral vascular accident, a stroke, which caused right side facial weakness, right leg weakness and foot drag. (M.R. 125.) Subsequently, plaintiff underwent physical therapy consultation.
23. On April 5, 1989, a bone scan of the left wrist and a CT scan of the left forearm from the elbow to the wrist were ordered. (M.R. 122.) On April 6, 1989, a bone scan was conducted and showed no evidence of metastasis[13] in the left wrist. The report indicated that the left wrist mass was consistent with inflammatory changes. (M.R. 126.)
24. A report of a CT scan conducted on June 19, 1989, stated that the mass was "slightly inhomogeneous"[14] in texture and that its appearance was non-specific, possibly representing a benign or a malignant mass and that a biopsy may be required for tissue diagnosis. At this time the mass measured *1229 3.55 × 4.8 × 2.5 cm. and extended from the skin surface to the bony structures. (M.R. 308.)
25. On July 12, 1989, an excisional biopsy of the tumor was performed at JCMC by Drs. Michael Feldman, Richard Johnston, and Daniel McGuire. (M.R. 199.) The report of the procedure, by Dr. Feldman, indicated the following:
a. The tumor, measuring 6 × 5 cm. in size, was encountered just underneath the skin and was seen to be adhering to the skin. It encased the extensor retinaculum (the dorsal carpal ligament) and the tendons in compartments 2 through 6. Superficial nerves were encased throughout the tumor; these nerves were sacrificed in order to excise the mass as a whole.
b. During the operation, a piece of the tumor was sent to the pathology department for immediate frozen section analysis; the pathologist immediately reported that the specimen was "probably malignant, either carcinoma or sarcoma," but that permanent sections of the tumor were necessary for a definite diagnosis.
c. The tumor was excised down to the periosteum (membrane covering) of the distal ends of the radius, the lunate, and the capitate (bones of the wrist). The tumor did not appear to have invaded the bones themselves, just to have extended down to them.
d. The excised tumor was sent to the pathology department for permanent sections. The wound was closed and the procedure concluded without complication.
(M.R. 198.)
26. Dr. Johnston's note of July 12, 1989, stated that, depending on cell type, plaintiff may require further operative treatment, such as below the elbow amputation. (M.R. 213.) He noted that the surgeons saw that the mass extended to the bone and enveloped superficial nerves and the tendons in compartments 2-6. (M.R. 214.)
27. Following the excisional biopsy performed on July 12, Dr. Manorama Mohapatra, a board-certified JCMC pathologist, received several specimens from plaintiff's left wrist tumor and performed a frozen section analysis. On July 18, 1989, she determined that the frozen section could be adenocarcinoma[15] or synovial cell sarcoma.[16] The slides were then sent to the Armed Forces Institute of Pathology (AFIP), a respected world-renown facility for performing pathological analyses, because the JCMC pathology department could not make a definite diagnosis. (M.R. 195.) Dr. Mohapatra observed that there were different diagnostic indicia present, from indications of cell sarcoma to metastatic carcinoma.
28. Dr. Mohapatra also took plaintiff's specimen slides to Barnes Hospital, which is affiliated with the Washington University School of Medicine, and showed them to two pathologists. One of the pathologists told her that it could be a monophasic sign of synovial cell sarcoma. This pathologist provided Dr. Mohapatra with a paper concerning this type of cancer. However, he did not do any special stain or any other test. Dr. Mohapatra also showed the specimen slides to another pathologist at Barnes Hospital, Dr. Louis Dehner. Dr. Dehner, the Chief of Surgical Pathology, examined the specimens with Dr. Mohapatra and they discussed them. Dr. Dehner told Dr. Mohapatra that he thought the specimens could be metastatic adenocarcinoma, synovial cell sarcoma, or a sweat gland tumor. But Dr. Dehner stated that he needed to analyze the slides with special stains and a few other studies before a specific diagnosis could be made.
29. On July 18, 1989, Dr. Johnston, one of the surgeons who performed the excisional biopsy, noted a provisional diagnosis of synovial cell sarcoma, which was made by the JCMC pathology department. He ordered an oncology consultation. The results of the oncology consult were that the tissue mass was most likely synovial cell sarcoma, "a rare subgroup of a rare malignancy," and that *1230 excision did not appear to be the proper treatment because of a high likelihood of recurrence. The report stated that the report of the AFIP remained pending. (M.R. 411.) The report also stated that the value of chemotherapy and radiotherapy had not been established for this condition. (M.R. 410.) This report also recommended three possible actions: (1) limb amputation, because wide excision of the mass may not be possible; (2) a CT scan, a bone scan, and a MUGA scan[17]; and (3) if there was no evidence of disease, either (a) no chemotherapy or (b) chemotherapy, if good myocardial function is found. (M.R. 410.)
30. Plaintiff was discharged on July 20, 1989. Dr. Feldman's discharge report indicated:
a. The pre-operative CT scan showed that the mass went to the level of the radius, but did not invade the bone. (M.R. 219.)
b. In the days after the tumor excision,
(1) Plaintiff's wrist wound appeared to be healing well and he was placed in a functional splint.
(2) Plaintiff's blood analysis indicated that he would fit the "adjuvant chemotherapy protocol for sarcoma" and that this would be followed up. (M.R. 218.)
Dr. Johnston also continued to believe that further surgery would be necessary, with or without chemotherapy.
31. On July 27, 1989, plaintiff was seen in the orthopedic clinic by Dr. Johnston. He noted the pathology report of synovial sarcoma and ordered a chest CT and a MUGA scan to rule out metastasis before any definitive therapy was selected. (M.R. 412.)
32. On July 28, 1989, plaintiff was seen in the neurology department for his stroke. (M.R. 413.)
33. On August 24, 1989, Dr. Johnston planned a left, below the elbow amputation to be performed on September 6, 1989. (M.R. 415-16). Also on August 24, 1989, Dr. Johnston discussed with plaintiff the oncology consult report that the highest chance for survival was with a below the elbow amputation and chemotherapy, with other options  external radiation treatments which did not have a proven success in synovial cell carcinoma. During that discussion, plaintiff agreed to the below the elbow amputation. (M.R. 415.)
34. On September 1, 1989, Dr. Madeline S. Mitchell, of the Armed Forces Institute of Pathology (AFIP), telephoned and advised Dr. Mohapatra at JCMC that plaintiff's wrist lesion was consistent with metastatic adenocarcinoma, with an indication that there was atypical vascular proliferation. (M.R. 250.)
35. On September 5, 1989, the JCMC pathology department received the AFIP's written report which contained a diagnosis of probable metastatic adenocarcinoma. (M.R. 416.) That report made the following diagnosis:
1. Adenocarcinoma, adnexal versus metastatic.
2. Dermal atypical vascular proliferation.
We see two lesions in this material. The large dermal and subcutaneous tumor composed of anaplastic glands in a desmoplastic stroma is an adenocarcinoma. The epithelial nature of the lesion is confirmed by strongly reactive immunostains for keratin. The case has been reviewed by the staff of the Department of Dermatopathology and they have considered the possibility of a primary sweat gland carcinoma; the features however are not typical and a metastatic adenocarcinoma cannot be ruled out. Therefore, clinical evaluation for another origin should be completed before accepting this as the primary site. The staff of the Department of Genitourinary Pathology has excluded metastatic prostatic adenocarcinoma aided by negative immunostains for PSA and PAP. The lesion does not display features of synovial sarcoma. In the dermis overlying this lesion there is a vascular proliferation in which the endothelial cells are bland. Because of this we favor a benign diagnosis but the diffuse pattern of spread in the dermis is unusual for a hemangioma. This could of course be due to alteration secondary to the adjacent *1231 large mass. In any event, complete excision of this additional lesion should be accomplished with treatment of the adenocarcinoma.
Gov.Exh.D (emphasis added).
36. Also on September 5, 1989, plaintiff was scheduled for a renal scan. (M.R. 416.) On September 6, 1989, the results of an intravenous pyelogram indicated an abnormal contour of the left kidney. The report also indicated a history of possible renal cell carcinoma; for this reason, an ultrasound examination was recommended. (M.R. 310.)
37. The September 12, 1989, medical note of Dr. Johnston recorded that the AFIP report diagnosed metastatic adenocarcinoma, probably of the renal cell. He stated, "This does not fit with the clinical picture nor the gross path[ology]. I still feel that it is a monophasic synovial cell. Pt will have further [work up] of 1 up and renal U/S. Patient will be scheduled for BEA [(below elbow amputation)] on 9/15/89." (M.R. 415-16.) From the diagnostic chest x-rays and the CT scan, Dr. Johnston reasonably believed the cancer had not originated at a location other than plaintiff's left wrist and that this was the only location of the cancer.
38. On September 14, 1989, a renal ultrasound was performed and no masses were indicated in the results. However, the visualization of the kidneys was compromised due to the patient's size. Evaluation of the kidneys by means of computer tomography was recommended.
39. In a pre-operative note on September 15, 1989, Dr. Johnston recounted the differing diagnoses: (1) synovial cell sarcoma, a diagnosis made by the JCMC pathology department; and (2) poorly differentiated adenocarcinoma, probably renal in nature,[18] a diagnosis suggested from information from Barnes Hospital and made by the AFIP. Dr. Johnston determined that from the "clinical picture" and the pathology report the tumor was most likely synovial cell, a virulent cancer. Dr. Johnston did not receive Dr. Dehner's opinions about the nature of plaintiff's cancer. He also noted that the oncological consultant said that the highest chance for survival was with a below the elbow amputation and chemotherapy, with other options. He noted that x-ray therapy did not have proven success with synovial cell cancer.
40. The possibility of amputation was again discussed with plaintiff on September 15, 1989, and again he chose amputation. (M.R. 271.)
41. The amputation of plaintiff's left hand, below the elbow, was performed on September 15, 1989. (M.R. 255, 256.) The tumor which developed in the left wrist of plaintiff was composed of a slow-growing, low-grade, sweat gland carcinoma. This cancer could have been diagnosed as such with an excisional biopsy procedure as early as February 1988.
42. Dr. Johnston believed that amputation was the appropriate course of action for two reasons. The first reason was his belief that synovial cell cancer needed to be removed by wide excision, that is, the removal of even the bony structures which the tumor touched, to be assured of the excision of all of the cancer cells. The second reason was his belief that the removal of only portions of plaintiff's wrist and hand would leave plaintiff with an entirely unusable limb below the elbow.
43. Dr. Johnston's determination to excise the cancerous growth by amputating the plaintiff's arm below the elbow fell below the required standard of medical care. Dr. Johnston was aware of the AFIP report, but rejected its diagnosis for insufficient reasons. A treating surgeon-physician should not reject a pathological report and perform a radical procedure, such as the amputation of a limb, except for paramount medical reasons.[19] In this case, Dr. Johnston rejected the AFIP report, because it did not fit his clinical picture of the plaintiff's condition. His clinical opinion was accurate as to the fact that the cancer originated at plaintiff's *1232 wrist and had not metastasized to that location. However, as to the nature of the cancer, the AFIP diagnosis ruled out virulent synovial cell cancer. As to the need to amputate the limb instead of a wide excision of the margin of the tissue mass, no record of any expert consultation exists which indicates that Dr. Johnston sought and considered any source of expertise for his opinion that the physiological aspects of the wide excision procedure, short of amputation, would have rendered plaintiff's limb useless, as he had determined. The low grade feature of the actually present carcinoma constituted little threat to plaintiff's life because the neoplasm was very unlikely to metastasize. Thus, surgical amputation was inappropriate for plaintiff's condition. With further consultation, Dr. Johnston would likely have seen, possibly with the aid of a consulting pathologist or oncologist, that there was a sufficient margin of unaffected cells between the cancer and the bony structure to eliminate the need to take out a portion of the bone in plaintiff's hand.
44. But for defendant's failure to conduct the appropriate diagnostic tests on plaintiff's left wrist mass in a timely manner, plaintiff would not have had his arm amputated.
45. But for defendant's incorrect identification and diagnosis of the type of tumor in plaintiff's left wrist, despite the advice of the AFIP, plaintiff would not have had his arm amputated.
46. But for the unnecessary amputation of plaintiff's left arm by defendant, plaintiff would have had the use of a functional left arm. The usefulness of his left arm and hand would have been substantial, had a wide excision of the tumor occurred in early 1988; had a wide excision of the tumor, instead of the amputation, occurred in September 1989 the usefulness of the limb would likely have been much less than it would have been in early 1988.
47. A psychology consult was ordered for plaintiff on September 18, 1989. (M.R. 244.) On September 20, 1989, plaintiff was referred to Dr. Wakefield, a psychologist, for evaluation. (M.R. 262.) Dr. Wakefield concluded that Mr. Boyce showed no signs of clinical depression. (M.R. 262, 419.)
48. After an x-ray on June 7, 1990, plaintiff's left arm stump was found to show no indication of disease. (M.R. 314, 462.)
49. Plaintiff is a 76-year-old white male who has a remaining life expectancy of 8.1 years.
50. Plaintiff's son operated a business called Tidy Pool which went out of business sometime in 1989. Plaintiff worked for his son during the summers of 1986, 1987, and 1988; he was paid $100 for each week he worked. However, he did not work every week.
51. Following plaintiff's October 1988 stroke, he was unable to walk for over a week. Plaintiff also lost his ability to speak. At the time of plaintiff's deposition in October 1992, he still had not regained his ability to speak well. His first stroke also affected plaintiff's ability to think. After plaintiff's first stroke and before his second stroke in March 1989, he never regained his full abilities.
52. After the surgery in September 1989, plaintiff was fitted for and was provided with a prosthesis by JCMC. Plaintiff did not have to pay for this prosthesis. Plaintiff has received physical therapy since the amputation. The physical therapy has been paid for by the United States. The government also paid for the training that plaintiff received for use of the prosthesis.
53. Plaintiff has no medical bills from any health care provider. Plaintiff does not owe any money to anyone for any medical treatment he has received with respect to his left arm.
54. Plaintiff has not suffered any lost wages. Since plaintiff's retirement, he has not had any job offers other than performing occasional services for his son.
55. Prior to the surgery in September 1989, the only activities that plaintiff engaged in were ceramics and some yard work. Josephine Boyce has always washed the dishes and washed plaintiff's clothes.
56. The loss of plaintiff's left hand has not caused plaintiff to be unable to drive a motor vehicle.
*1233 57. The reason plaintiff cannot bathe and is unable to dress himself is not because of the amputation, but rather because of the strokes he has suffered.
58. Since the amputation, plaintiff does not have any pain in his left arm.
59. Josephine Boyce has never had a license to drive a motor vehicle.
60. Before the amputation of his left arm, William Boyce was and after the amputation remains an insulin dependent diabetic.
61. As a direct result of both the loss of her husband's left arm and of his strokes, Mrs. Boyce must help Mr. Boyce to dress himself. She assists him with his personal hygiene. She cuts his food at meals. She opens his medicine bottles and she administers his insulin injections.
62. As a direct result of: (1) defendant's failure to timely conduct the appropriate diagnostic tests shortly after receiving the non-malignancy needle biopsy report in February 1989; (2) defendant's incorrect diagnosis and refusal to accept the correct diagnosis prior to amputation; and (3) defendant's unnecessary amputation of plaintiff's left arm, plaintiff William Boyce has suffered and sustained the following damages:

(a) Past noneconomic damages: $100,000.00
(b) Future noneconomic damages: $100,000.00
(c) Past economic damages:
 (1) Medical: $ 0.00
 (2) Earnings: $ 0.00
(d) Future economic damages:
 (1) Medical: $ 0.00
 (2) Earnings: $ 0.00
 ___________
 TOTAL $200,000.00

63. As a direct result of: (1) defendant's failure to timely conduct the appropriate diagnostic tests shortly after receiving the non-malignancy needle biopsy report in February 1989; (2) defendant's incorrect diagnosis and refusal to accept the correct diagnosis prior to amputation; and (3) defendant's unnecessary amputation of plaintiff's left arm, plaintiff Josephine Boyce has suffered and sustained the following damages:

(a) Past noneconomic damages: $ 25,000.00
(b) Future noneconomic damages: $ 25,000.00
(c) Past economic damages:
 (1) Medical: $ 0.00
 (2) Earnings: $ 0.00
 ___________
 TOTAL $ 50,000.00

An appropriate judgment is entered accordingly.

ORDER
IT IS HEREBY ORDERED that the motion of defendant to amend and correct the judgment previously entered in this action (Doc. No. 72) is sustained, in that the following Amended Judgment is hereby entered:

AMENDED JUDGMENT
This action was tried to the Court sitting without a jury, the undersigned United States Magistrate Judge presiding by consent of the parties under 28 U.S.C. § 636(c)(3). The Court having rendered its findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52(a),
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiff William F. Boyce have and recover from defendant United States of America as actual damages the total sum of Two Hundred Thousand Dollars ($200,000.00), plus interest thereon after the time allowed by law and at the rate allowed by law, plus the costs of the action.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that plaintiff Josephine M. Boyce have and recover from defendant United States of America as actual damages the total sum of Fifty Thousand Dollars ($50,000.00), plus interest thereon after the time allowed by law and at the rate allowed by law, plus the costs of the action.
NOTES
[1] Defendant objected to that part of Dr. Johnston's testimony in which he, for the first time, disclosed his expert opinions that the Veterans Hospital staff fell below the required standard of care by not performing the diagnostic steps which would have lead to the excision of the mass earlier than July 1989 without the need for the amputation in September 1989. The defendant's objection was taken with the case and will be discussed below.
[2] The court sustained the objection of the defendant to Dr. Citron's testimonial opinion that Dr. Johnston's choice of a below the elbow amputation in September 1989 was the wrong choice of treatment. The reason for the court's ruling was that this expert opinion had not been previously disclosed to the defendant.
[3] Unless otherwise indicated, references in this opinion to "plaintiff" or to "Boyce" are to plaintiff William F. Boyce.
[4] Unless otherwise indicated, references to physicians are to physicians employed by the United States by contract or otherwise.
[5] References to "M.R." are to the pages of the single set of medical records received in evidence.
[6] "a cyst containing ... liquid within fibrous tissue ...; usually attached to a tendon sheath in the hand, wrist, or foot, or connected with the underlying joint." Steadman's Medical Dictionary at 630 (25th ed.)
[7] "Uptake" is defined as the absorption by a tissue of some substance and its permanent or temporary retention. Steadman's Medical Dictionary at 1669 (25th ed.)
[8] Plaintiff alleges that the failure to conduct such a diagnostic procedure until July 1989 violated the standard of care ordinarily used by physicians under the same or similar circumstances.
[9] Dr. Johnston testified at trial that the failure of the JCMC medical staff to perform appropriate diagnostic tests in February and March 1988 fell below the required standard of care. Defendant objected to this testimony because it had not been previously disclosed. The finding and conclusion that the JCMC medical staff did not commit medical malpractice by its handling of plaintiff up to June 1988 moots defendant's objection to Dr. Johnston's opinions.
[10] "Synovial" is defined as pertaining to fluid. Steadman's Medical Dictionary at 1541 (25th ed.)
[11] "Hyperplasia" is defined as an increase in cell structure. Steadman's Medical Dictionary at 744 (25th ed.)
[12] "Neoplasm" is defined as a tumor or abnormal tissue growth, whether benign or malignant. Steadman's Medical Dictionary at 1029-30 (25th ed.)
[13] "Metastasis" is the spread of a disease process from one part of the body to another. Steadman's Medical Dictionary at 954 (25th ed.)
[14] Not having uniform structure throughout. Steadman's Medical Dictionary at 722 (25th ed.)
[15] "Adenocarcinoma" is a cancerous condition of a gland. Steadman's Medical Dictionary at 24 (25th ed.) Adenocarcinoma is known to be slow-growing in nature.
[16] "Sarcoma" is defined as a connective tissue neoplasm, usually highly malignant, formed by a proliferation of mesodermal cells. Steadman's Medical Dictionary at 1382 (25th ed.)
[17] This test determines the quality of the patient's heart function, to determine whether the heart can avoid failing from the administration of medications.
[18] Dr. Johnston knew that, if the cancer had metastasized from the plaintiff's kidneys, there would be no benefit from excising the cancer from the wrist.
[19] See Testimony of Dennis Citron, M.D.